MERCANTILE TRUST Co. *v.* TEXAS & P. RY. Co. *et al.* FARMERS' LOAN
& TRUST Co. *v.* INTERNATIONAL & G. N. R. Co. *et al.* MERCAN-
TILE TRUST Co. *v.* ST. LOUIS S. W. RY. Co. OF TEXAS *et al.* SAME
*v.* TYLER S. E. RY. Co. OF TEXAS *et al.* FARMERS' LOAN & TRUST
Co. *v.* GULF, C. & S. F. RY. Co. *et al.*

(*Circuit Court, W. D. Texas.* August 23, 1892.)

Nos. 186–190.

1. RAILROAD COMPANIES — REGULATION OF RATES — STATE COMMISSIONS — RIGHTS OF
BONDHOLDERS.
   The mortgage bondholders of certain railroads in Texas brought bills against the
   railroad companies and against the state railroad commissioners and the attorney
   general, alleging that the full interest on the bonds was not being paid or earned;
   that in most cases the earnings were even insufficient to pay operating expenses;
   that the railroad companies were willing and anxious to meet all their obligations
   to complainants, but were prevented from exercising their judgment and discre-
   tion in making remunerative rates of transportation by the defendant commis-
   sioners, under pain of the severe penalties prescribed by the railroad commission
   law. Act Tex. April 3, 1891. Complainants claimed that this act was in violation
   of the constitution of the United States, and prayed an order enjoining the commis-
   sioners from putting or continuing in effect any schedule of rates prescribed by
   them, and restraining them and the attorney general from suing for any penalties,
   or otherwise enforcing the provisions of the act. *Held,* that complainants showed
   a sufficient interest in the roads to entitle them to maintain the suits.

2. SAME—RIGHT TO SUE IN FEDERAL COURTS—COLLUSION.
   A suggestion of collusion between complainants and defendant railroad com-
   panies in bringing the suits was without merit, for whether or not the companies
   themselves could sue under section 6 of the act, and obtain all the relief complain-
   ants are entitled to, the latter are entitled to enforce their rights in the national
   courts; and that right is not affected, even if there was a previous understanding
   between them and the railroad companies that relief would be more speedily and
   effectually obtained in the federal courts.

3. SAME—FIXING RATES—NOTICE—DUE PROCESS OF LAW.
   Under section 4 of the act, which provides that the commission shall give notice
   and hearing to the railroads affected before establishing any rates, the commission
   sent out notices to all the railroads in Texas that on a specified date they would be-
   gin the classification of freights and the fixing of rates. On that day the repre-
   sentatives of the railroads appeared, and for several days the question of classifica-
   tion and rates was discussed in general, but no particular rates or changes from
   existing rates were proposed. Thereafter, and without further hearing, the com-
   mission proceeded to prescribe rates from time to time and put them in force.
   *Held,* that these proceedings did not constitute "due process of law," and the rates
   fixed were void, under constitution of the United States.

4. SAME—CONSTITUTIONAL LAW.
   Section 5 of the act provides that, "in all actions between private parties and rail-
   way companies brought under this law, the rates, charges, orders, regulations, and
   classifications prescribed by said commission before the institution of such action
   shall be held conclusive, and deemed and accepted to be reasonable, fair, and just,
   and in such respects shall not be controverted therein until finally found otherwise
   in a direct action brought for that purpose in the manner prescribed by sections 6
   and 7 thereof." Section 6 provides for actions by railroad companies against the
   commissioners for the purpose of testing the reasonableness of the rates prescribed,
   and section 7 declares that in all such actions the burden shall be upon the com-
   panies to show that such rates are unreasonable and unjust. *Held,* that section 5,
   and all other provisions of the law which tend to enforce a compliance with the rates
   fixed by the commission irrespective of their reasonableness, or tend to embarrass
   such roads as seek to invoke the protection of the federal constitution against the
   taking of their property without due process of law, are unconstitutional.

In Equity. Suits for injunction. On motion for temporary injunc-
tions. Granted.

*John F. Dillon, E. B. Kruttschnitt, H. B. Turner,* and *John J. McCook,* for complainants.

*W. S. Pierce, J. W. Terry, Alex. G. Cochran, W. W. Perkins,* and *R. S. Lovett,* for defendant railway companies.

*C. A. Culberson,* Atty. Gen., *T. J. Brown,* and *Hy. C. Coke,* for railroad commission of Texas.

McCORMICK, Circuit Judge. A glance at the public history of railroad interests in Texas will help us to see the true state of the issues joined in these suits. With some trifling exceptions near the gulf coast, Texas has no navigable waters. The need of railroads was therefore early felt. When, by the compromise of her claims to the Santa Fe territory, she received a fund which she dedicated to the support of the public free schools, she adopted the policy of loaning this fund to aid in the construction of railroads, taking a first mortgage lien. She also passed a general law extending donations of land to aid and encourage these necessary highways. And February 7, 1854, she passed a general law providing, among other things:

"It shall be lawful for the legislature at any time to prescribe rates to be charged for the transportation of persons and property upon any such road, should they be deemed too high, and may exercise the same power every ten years: provided, that no reduction shall be made unless the net profits of the company for the previous ten years, the expenditures of the company being *bona fide,* and not with a view to defeat the operation of this section, shall amount to a sum equal to 12 per cent. per annum upon its capital stock, and then so as not to reduce the future probable profit below the said per centum."

These enterprises were in a measure suspended during the civil war, but immediately on its close the people of Texas in the constitution adopted in 1866 ordained that—

"A well-regulated system of internal improvement is calculated to develop the resources of the state, and promote the happiness and prosperity of her citizens. Therefore the legislature shall have power and it shall be its duty to encourage the same, and the legislature shall have power to guaranty the bonds of railroad companies to any amount, not exceeding in any case the sum of $15,000 per mile."

Operation under this constitution was suspended by the passage of the reconstruction measures in 1867, and the constitution itself was superseded by the new constitution, which went into full effect March 30, 1870. The provision quoted from the constitution of 1866 was not retained in the new constitution. Touching this subject it provides, in article 10, § 5:

"All public lands heretofore reserved for the benefit of railroads, or railway companies, shall hereafter be subject to location and survey by any genuine land certificates."

Section 6:

"The legislature shall not hereafter grant lands to any person or persons, nor shall any certificate of land be sold at the land office, except to actual settlers upon the same, and in lots not exceeding 160 acres."

This was speedily amended so as to authorize the legislature to make grants of land for purposes of internal improvements, not to exceed 20 sections of land for each mile of completed work, in aid of the construction of which land may be granted. Until the 15th of August, 1876, there was in Texas no general law providing for the organization of railroad corporations, and up to that time such corporations could only be created by an act of the legislature.

Upon the complete restoration of our federal relations in 1870, many active individual and associated promoters of railroad enterprises pressed their projects on the legislature. The field was new and large, and many grants were obtained, some of which were afterwards deemed improvident. In 1871 a general act was passed to authorize counties, cities, and towns to aid in the construction of railroads and other works of internal improvement, and the same or like active promoters as those who had solicited the legislature secured donations, loans, or subscriptions to stock to their various projects from many counties, cities, and towns in the state, said aid taking the shape of bonds, as provided for in this act and in subsequent acts. These bonds of the counties, cities, and towns, as well as the bonds of the railroads themselves, were negotiable, and came to be held largely by citizens of other states, or by aliens; and, default being made in the payment of interest, much litigation arose thereon, and more was imminent in the circuit courts of the United States. Several of the western states had preceded us in this career of progress, and the bitter controversy, which had ripened into what are popularly called the "*Granger Cases*," was raging, and had not been settled by the supreme court when the Texas constitutional convention—the third in nine years—met, in 1875.

The constitution then framed, and which, having been adopted, went into effect April 18, 1876, embraced this provision:

"The legislature shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this state, and shall, from time to time, pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on said railroads, and enforce all such laws by adequate penalties."

In obedience to which the legislature did pass laws establishing maximum rates of charge for transportation of passengers and freight on railroads, and providing that any railroad charging or receiving a greater rate shall forfeit and pay to the party injured thereby a penalty of $500, to be recovered before any court having jurisdiction of the amount, in any county through or into which the passenger or freight may have been transported; which laws are still in force. Several parallel and competing lines of railroad were constructed through the state from south to north and from east to west, with many branches and dependent or independent connecting lines. These all encountered the pecuniary embarrassments incident to the construction and operation of new roads across an undeveloped territory, and nearly all of them at one time or another, and some of them more than once, had to submit to a process of reor-

ganization through the courts. . From the very nature of the case and the state of the parties, resort was usually had to the United States courts. Receivers were appointed to hold and operate the properties pending the progress of the chancery proceedings; earnings, beyond necessary operating expenses, were concentrated upon much-needed repairs and betterments; and for this purpose, to some extent, earnings were anticipated, and even the *corpus* of the property charged by the issuance of receiver's certificates. On the leading lines the service was conspicuously improved. The bondholder was getting no interest. He was either an alien or was a citizen of another state. Traffic increased. Some roads completed their reorganization, and began to pay interest on their bonds.

Railroad operations began to affect, more or less directly, every place and every person in the state. Systems of connecting lines were developed. Schedules were observed. The number of officers and employes came to attract attention. Many claims for damages for personal injuries or other causes were made against the roads, which were not allowed, and resort was had to the law courts. There was no law prohibiting champerty in this state, (*Bentinck* v. *Franklin*, 38 Tex. 458,) and the rule in suits for damages against railroads was that the attorney for the plaintiff had only a contingent fee, generally a half interest, in the amount he could recover; and in such trials before juries in all the domestic trial courts the argument of counsel assumed that tone of eloquent accusation reasonably to be expected from such conditions. The volume of accusation soon swelled beyond the jury box and the chambers of the courts, and patriotic and ambitious eloquence began to fire the popular heart with its fierce phillippics against the greed of associated wealth and of corporate power. The other side was not idle or silent; the contest between the adversary parties waxed warm. The legislature was their Chæronea, where the fight was furious. The legislature appeared to be unequal to the emergency. Congress had established the interstate commission. A dozen or more states had established state commissions. The call here was for a commission. One most eminent lawyer, who commanded universal respect, who had, at a venerable age, retired to a chair in the law school of the state university, doubted the power of the legislature, under our existing constitution, to establish such a commission. Yielding to this authority, the legislature proposed an amendment to the constitution which was intended to confer that power. Its adoption was at once made a party test by the controlling political party in the state. Candidates for the legislature and for all the state offices were nominated and conducted their canvass with reference to it. Its adoption, and its immediate subsequent enforcement, was the issue which overshadowed all other issues. At the election held the 5th of November, 1890, it was carried, and its friends elected by the usual Texas majority. of 100,000 or more.

On the 7th of March, 1887, the supreme court had decided the case of *Robbins* v. *Taxing Dist.*, 120 U. S. 489, 7 Sup. Ct. Rep. 592, holding what is popularly known as the "drummer's tax" to be unconstitutional. A similar tax was being enforced by criminal process against

delinquents in this state, and our state court of last resort, on the 22d of June, 1887, in a well-considered opinion, declined to yield its own convictions to the authority of the *Robbins Case,* and refused to enlarge a prisoner held for the nonpayment of said tax.    *Ex parte Asher,* 23 Tex. App. 662, 5 S. W. Rep. 91.    The prisoner sued out a writ of error to the supreme court.    On the hearing in that court the present governor, then attorney general, appeared on behalf of the state of Texas, and made an oral argument.    The supreme court was not able to distinguish the Texas tax from the one involved in the *Robbins Case,* and on the authority of the *Robbins Case* and of *Leloup* v. *Mobile,* 127 U. S. 640, 8 Sup. Ct. Rep. 1380, reversed the judgment of the Texas court, and discharged the prisoner.    *Asher* v. *Texas,* 128 U. S. 129, 9 Sup. Ct. Rep. 1.    The United States judges in Texas were controlled by the decision in the *Robbins Case* from the time it was announced.    On the 24th of March, 1890, the supreme court decided the case of *Chicago, M. & St. P. R.* v. *Minnesota,* 134 U. S. 418, 10 Sup. Ct. Rep. 462.    On January 13, 1891, the twenty-second legislature met.    On the 21st day of that month the governor in his general message addressed them in this language on the subject of "Federal Officers:"

"In her independent autonomy Texas should be sovereign and free in the management of her own domestic affairs.    Cordially and with pride she claims and feels an interest in the federal union, as one of its important members. In all the powers delegated to it she cheerfully joins, to the end that the general government may be honored and respected within its legitimate sphere. In the administration of her own affairs she expects and demands recognition and respect.    For many years past the people have been terrorized by the judicial arm of that government, not for offenses they have committed, but because they dread the menace of arbitrary power that so often threatens their liberties.    Removed so far from the seat of government, it is difficult for the highest officers and courts to fully understand the frequent outrages inflicted upon the innocent people of this state by inferior officers and the subordinate federal judiciary.    * * *    The gracious writ of *habeas corpus* has been abused more than one time by a federal judge to obstruct the collection of state revenues, or in releasing citizens held in obedience to the orders or warrants of state courts, whose rights could have been asserted through the regular channels of the state judiciary.    Some of the railroads have been placed and held in the hands of receivers long beyond the term prescribed by our state laws, and occasionally are operated by nonresident receivers under the orders of federal judges in other states.    With respect to such property the decrees and opinions of the state's highest courts are held for naught and in contempt, to the injury of the citizens and the humiliation of the people.    Several of these roads, without foreclosure proceedings, have been permitted to increase their incumbrances to the detriment of the public and lawful creditors without check or hindrance, and from all appearances, to an ordinary citizen or skillful observer, as he learns of the exorbitant fees and salaries paid to useless officers in the apparent indulgence of favoritism and nepotism, the connection of the judges and officers with the receiverships and roads would demand investigation.    * * *    Honorable exceptions to all such misconduct among federal officers exist in this state.    They are well known and fully appreciated by the public.    In view, however, * * * of the peculiar conditions surrounding the railway management of the state,

and of the utter indifference that seems to have been shown by some of them to the state and her courts and officers in the administration of public affairs, the time has doubtless come when duty would impel action on the part of the state at her own expense to have all such matters investigated, to the end that the guilty may be exposed and punished, and all stains created by such suspicions removed from the innocent. The citizen would be helpless in a contest with such officers, but the state is amply able to enter into it and stand the cost. If wrongs have been done by any federal officer to the dignity of our state, there are tribunals before which he can be carried, and justice suitably administered to him. In view of the premises, your honorable bodies are respectfully requested to place a suitable appropriation at the command of the executive for use in defraying the expenses of all necessary prosecutions in the protection of her rights in all respects as a sovereign state." House Jour. 22d Leg. Tex. pp. 114, 115.

The railroad commission law, set out in full in the margin, was enacted and approved April 3, 1891.[1]

The original bills in these suits were filed on the 30th of April, 1892, and notice given that complainants would present their motions for hearing before me at Dallas, Tex., on the 16th of May, 1892. Before the day set for hearing arrived, I advised counsel that I could not hear the motions at Dallas on the 16th of May, but would hear them at New Orleans, where I would have the aid of the senior circuit judge, on the 23d of May. At the solicitation of the defendant the attorney general, the time for the hearing was postponed, and the motions reset to be heard at New Orleans on the 23d of June, and again at his request a further postponement was allowed and the hearing set for July 20th, at Dallas, Tex., at which last-named date and place the hearing began and continued from day to day, until and including the 30th of July.

Nine eminent lawyers of distinguished reputation for ability and learning, each of whom showed a complete mastery of the essential features of the whole record, and a minute and perfect knowledge of the details of the part to which he specially addressed his argument, were heard without limit. The record is large,—bills, answers, exhibits, affidavits, a burden for two strong men, I observed, when it was brought to me. The learning of the legal profession was exhausted in the citations of authority and the reasoning of the experienced and skillful solicitors. I was specially requested to consult and carefully consider the references to over 50 volumes, which were furnished me with the record. The gravity of the case must tax the faculties of a single judge, and the responsibility of correctly weighing it might well appall his perceptions and judgment, but for the fact, alluded to by the attorney general when he said, in his oral argument, "this case will go to the supreme court."

The most vital question involved has, from the 19th day of June, 1215, (we need not go beyond that date,) engaged the supreme attention of English-speaking people. The principle underlying it is the bedrock of our civilization, older and stronger than our written constitutions, state or national, but well expressed in both. Its application

[1] See note at end of case.

to issues similar to those here made has been so fully considered of late years by the supreme court, and so elaborately discussed in their opinions. as to forbid anything more than a reference to their latest decisions.

As stated in the brief of one of their counsel, the two trust companies, complainants, are trustees of various mortgages executed by the several defendant railway companies to secure bonds issued by those companies, respectively. The individual defendants are Reagan, McLean, and Foster, who were appointed and qualified as commissioners in the manner prescribed in section 1 of the Texas railroad commission act. These defendants organized the said commission on the 10th of June, 1891, from which date they have assumed to be and to act as the railroad commission of Texas, and are exercising and claiming to exercise all the powers and functions conferred, or purporting to be conferred, by the said act upon the said railroad commission. They have established and undertaken to enforce, in respect of all the defendant railway companies, such rules and rates, and have made and are enforcing the other orders, as set forth in the bills of complaint, and Exhibit C, thereto attached.

The defendant railway companies have filed cross bills in the several cases. The bills and cross bills raise substantially the same questions. One ground for relief presented by the bills is—

"That the tariffs, schedules, and orders of the commission, viewed as laws enacted under the power delegated by the legislature, are unconstitutional and void, because the tariffs. schedules, and orders established by the commission, complained of in the bills of complaint, are unreasonably low and confiscatory."

Another ground is:

"The railroad commission act of the legislature of Texas, in the respects complained of in the bills of complaint, is unconstitutional and void, because (1) it purports to confer upon the commission power and authority to establish the tariffs, schedules, and orders above recited; (2) it denies to railway companies the right, in suits for damages and penalties denounced by the act, to interpose the defense that the tariffs, schedules, or orders of the commission, with respect to the violation of which said damages or penalties may be claimed, are unreasonable and void, and in such suits it denies to the railway companies the right to a judicial inquiry in this behalf, thereby denying to railway companies subject to the act the equal protection of the laws, and subjecting them to conditions under which they are deprived of their property without due process of law."

The relief prayed in these motions is a temporary injunction, until the hearing against the railway company, from putting or continuing in effect the tariffs, circulars, or orders of the commission, and restraining the defendants constituting the commission, and the defendant Culberson, and all other persons, from instituting or causing to be instituted suits contemplated by the act for the enforcement of any claims arising out of its provisions, or out of any of the tariffs, circulars, and orders prescribed by the commission, and enjoining the commission from making or delivering to the railway companies any further tariffs, circulars, or orders.

The contentions of the defendants Reagan, McLean, and Foster and

Culberson, as far as deemed material to notice, are (1) that the bills do not show the right of the complainants to sue; (2) that the suits are believed to be collusive and preagreed as to the defendant railway company; (3) that as to these defendants the suits are really against the state.

It is apparent from the whole record and the conduct of this hearing that the controversy is not between complainants and the railways, but between the railways and the other defendants. The bills of complainants and the answer and cross bills of the railways, and the arguments of their counsel, show that there is no such element of collusion in these cases as can prejudice the rights of complainants to sue. The cases cited and pressed by counsel for defendants on this point are plainly different from the cases here. The complainants here show equitable interest in the fair earnings of the roads; they show actual ownership and possession of the mortgage securities of the roads, both of which they allege are being irreparably injured and threatened with destruction by the defendants; they show that the railways are willing and want to meet all their obligations as mortgagors in possession, but that said railways are coerced by the defendants, armed with the railroad commission act, and the directors cannot exercise their judgment and discharge their duty as they should and would but for said coercion.

It may be that the railway companies could, under section 6 of the railroad commission law, or without the authority of that section, have brought these suits and obtained all the relief to which the complainants are entitled against the other defendants, or it may be that they could not. If they could not, that would only be one additional reason why the complainants should sue; and, if the railways could have so sued, that would be no reason for denying the complainants any right, even if, as seems to be hinted rather than charged, the railways could only have resorted to the state courts; and that there was a previous understanding between the complainants and the railways that the relief complainants desired and believed themselves entitled to receive, would be more likely to be speedily and adequately extended in the national courts. It was to meet such cases that the national courts were established. In them parties "may hope to escape the local influences which sometimes disturb the even flow of justice." *Davis* v. *Gray*, 16 Wall. 221.

What has already been said expresses sufficiently my view as to the suggestion, and the authority in its support, that the injury inflicted and threatened, if any, was done and directed to the mortgagor in possession, and is too remote to give the complainants the right to sue. It may be conceded that there is no express decision of the supreme court or of other courts of authority on this question, but as to this point the case of *Peik* v. *Railway Co.*, in 94 U. S. 164, is substantially the same as these cases. That case was strongly controverted. Lawyers of the highest national reputation argued it elaborately and at great length in the supreme court. The same question was involved in the case of *Stone* v. *Trust Co.*, 116 U. S. 307, 6 Sup. Ct. Rep. 334, 388, 1191; and, while the failure to raise or notice this question in the progress and de-

cision of those cases prevents their being relied on as authority on this point, the fact that it was not raised or noticed is persuasive in the direction of the inclination of my judgment in this case that complainants show a right to sue. The case of *Murdock* v. *Woodson*, persuades to the same conclusion. 2 Dill. 188 et seq.

As to the contention that these are suits against the state, it seems clear to me that the latest decisions of the supreme court settle that question against the defendants. In *Pennoyer* v. *McConnaughy*, 140 U.S. 1, 11 Sup. Ct. Rep. 699, the construction and application of the eleventh amendment is fully discussed, the earlier decisions reviewed, their doctrine extracted, and the line clearly marked between those cases against state officers which are suits against the state in the sense of that amendment and those which are not, and these cases come plainly within the latter class. As suggested to the counsel at the hearing, we cannot reason against the authority of the supreme court, nor give it additional weight by our indorsement or argument. Where, as in the case last cited, that court has construed the earlier cases and announced the rule, the limit of our office is to arrive at the right in the cases on trial by that rule. And it appears to me not to admit of question that, on the authority of that case, these are not suits against the state, within the meaning of the eleventh amendment.

We come now to consider, have the complainants made out their case? Are the rates being enforced against the railways unreasonably low and confiscatory? Is their property being taken, or threatened with being taken, without due process of law, or are they denied the equal protection of the laws? And, if so, what measure of relief, if any, can this court now extend to the original and cross complainants?

From the sworn pleadings, the exhibits, affidavits, and unquestioned statements of honorable counsel conversant with the facts made during the argument in open court on the hearing of these motions, I draw my conclusions of fact touching the matters now deemed material. On these essential issues the complainants and cross complainants have offered the affidavits of the present or former chief officers and employes of the companies,—witnesses most conversant with the facts, and with regard to many of whom the defendant the attorney general, in his able oral argument, was candid enough and generous enough to say: "I know them; they are respectable gentlemen, of high character, who would not and could not willfully make a false statement."

In the race to occupy territory, or to avail of the state's donations of land, or to get a basis for the issuance and placing of their bonds, or to meet the crying want of communities along their projected lines, or for one, or more, or all of these considerations, the defendant railways hurried the construction of their lines, and opened them for business in a green and unfinished condition, with unseasoned roadbeds, ties, rails, culverts, and bridges, and rolling stock not adequate to move or bear the weight of their present traffic, and with very little terminal and way-station equipment. That in large sections of the state through which these railways pass, the most fertile, fully occupied, and developed, and

furnishing the bulk of their domestic freight and passenger traffic, the character of the soil is such as renders it extremely difficult and expensive to construct and to maintain a sound roadbed, and to keep the ties on top of it; time and use and constant large additions to the dump being required, and these not always efficient. That the cost of construction and equipment up to the time when these roads were respectively opened for business was far short of the proper cost of their plant as it exists to-day. That this proper cost of their plant as it exists to-day exceeds, in the case of each of these railways, the amount of its bonded indebtedness. That these roads could be duplicated only by going through a similar process of seasoning, and that even with the present reduced market value of much of the construction and equipment material, and the advantages of transportation of the same to interior points, which existing roads would furnish, such duplicates, with equal right of way, roadbed, track, rolling stock, terminal and way-station facilities, could not be acquired and constructed now for less money than these roads have cost. That the earnings of these roads have not been diverted to improper uses. That their regular rates for passengers have been the maximum allowed by statute, and they have charged and received for the carriage of freight, within the maximum allowed by law, such rates as the commercial and competitive conditions would permit and the particular commodity would bear. That said rates have always been much lower than rates and charges for like transportation of like articles prior to the opening of said roads. That none of these railways, except the Gulf Company, and it only once eight years ago, has ever paid any dividend on its stock. Four of these railways have had to submit to the process of reorganization under foreclosure proceedings, two of them the second time, and the Gulf Company, which has so far escaped this ordeal, "now owes a floating debt, including unpaid interest coupons, of upward of $3,300,000."

I adopt from the brief of complainants' counsel this statement, which I have found to be accurate:

"With inconsiderable exceptions, not resulting in increased revenues, the commission has reduced every tariff which it touched. The facts established by the proof in each case may be thus summarized:

### "THE TEXAS & PACIFIC CASE.

"(1) The rates fixed by the operation of prevailing commercial and competitive conditions, and in effect at the time when the series of reductions inaugurated by the commission was commenced, were so low and inadequate that this company, after the payment of the expenses of operation and repairs and the cost of necessary betterments and equipment, was unable to earn more than the interest on its prior and fixed mortgage indebtedness, namely, 5 per cent. on an indebtedness of $17,182.60 per mile of road operated, equivalent to 6 per cent. on only $14,318.50 per mile of road operated. These earnings excluded the possibility of payment of interest on the company's second mortgage income bonds, or of any dividend on its stock.

"(2) The actual loss to defendant from the application of the commission's rates to the volume of business transacted from the time when these rates were declared to be effective until the 31st day of March, 1892, (about seven months,) has aggregated the sum of $212,721.61, the entire loss being in net

revenue. The property of this company was in the hands of receivers during the years 1885-1888, in suits to foreclose its mortgages, and was restored to the company in the latter year, after a reorganization of its indebtedness involving heavy losses to its security holders and a substantial reduction of its fixed charges. Its stockholders were compelled to contribute an assessment of 10 per cent. upon the par value of their stock, aggregating about $3,000,-000. This amount—this new capital—was expended upon the property in its improvement, betterment, reconstruction, and equipment, and the necessary cost of reorganization.

### "THE COTTON BELT CASES.

#### "(St. Louis Southwestern of Texas and Tyler Southeastern.)

"(1) These companies did not take possession of their respective properties until June 1, 1891, and hence the rates prevailing prior to the announcement of the commission's tariffs affected them only during the light summer months of June, July, and August, and a part of the month of September, 1891.

"(2) Under the rates established by the railroad commission, these companies are not able to earn necessary operating expenses. The earnings of the St. Louis Southwestern of Texas for the eleven months ending April 30, 1892, fell short of providing for necessary expenses of operation by the sum of $29,172.66. The earnings of the Tyler Southeastern Company for the same period fell short of providing for necessary expenses of operation by the sum of $43,851.99. Both of these companies have been compelled to borrow money to cover the deficit in their earnings to meet operating expenses, and to provide for the interest on their fixed mortgage obligations. The St. Louis Southwestern of Texas owes a floating debt of over $275,000, and the Tyler Southeastern of over $43,000, incurred for these purposes. The properties of these companies were purchased by them in the early part of 1891 upon sales under suits to foreclose the mortgages of their predecessor companies, the St. Louis, Arkansas & Texas Railway Company of Texas and the Kansas & Gulf Short Line. The new companies were organized on a basis of largely decreased fixed charges.

### "THE INTERNATIONAL & GREAT NORTHERN CASES.

"(1) The rates fixed by the operation of commercial and competitive conditions, and, in effect, at the time when the series of reductions inaugurated by the commission was commenced, were so low and inadequate that this company, after the payment of the expenses of operation, was unable to earn the interest upon either class of its bonds. For the year ending December 31, 1891, its net or surplus earnings amounted to $449,637, or $34,003 less than the interest charge upon its first mortgage bonds. These net earnings would only suffice to pay an interest charge of 6 per cent. upon $9,540.67 per mile of road owned and operated by the company. For the three months ending March 31, 1892, the necessary operating expenses of the road exceeded its earnings by the sum of $80,109.09.

"(2) The actual loss to this railroad from the application of the commission's rates to the volume of business actually transacted from the time when these rates were declared to be effective until the 31st day of March, 1892, (about seven months,) shows a greater loss than at the rate of $200,000 per annum. For upwards of three years last past the railroad and property of this company had been in the hands of receivers appointed by the district court of Smith county, Tex. By reason of the insufficiency of its earnings, the railroad company was unable to pay the interest upon its first and second mortgage bonds during the year 1889 and subsequent years. In January, 1892, the defaulted interest upon its first mortgage bonds amounted to $1,441,720, and upon its second mortgage bonds to $1,269,720. In that month an agreement of reorganization was entered into between the company and its secu-

rity holders, involving the funding of all defaulted interest, and the reduction of all future interest upon the second mortgage bonds, and the deferred payment of a part of the defaulted interest upon the first mortgage bonds. The stockholders of the company were compelled to contribute new capital to the amount of over $1,000,000,—about 11 per cent. upon the par value of the outstanding capital stock of the company.

### "THE GULF, COLORADO & SANTA FE CASE.

"(1) The rates fixed by the operation of prevailing commercial and competitive conditions in effect at the time when the series of reductions inaugurated by the commission was commenced were so low and inadequate that this company, after the payment of the expenses of operation and repairs and the cost of necessary betterments and equipment, has been unable to earn the interest upon its first mortgage bonds, such earnings falling short in the year ending June 30, 1891, of an amount sufficient to meet such interest in the sum of $289,906.81. These earnings excluded the possibility of payment of any interest on the company's second mortgage bonds or of any dividend upon its stock.

"(2) The actual loss to this company from the application of the commission's rates to business actually transacted for the eight months ending February 29, 1892, in comparison with the same period ending February 28, 1891, aggregates the sum of about $300,000. The bonds of this company are issued at the rate of $12,000 per mile of first mortgage bonds; $8,000 per mile of second mortgage bonds; total, $20,000 per mile of road owned by the company. In order to obtain the sums of money to defray the cost of necessary betterment, improvement, and equipment of its property, and to meet the deficits of earnings to pay the operating expenses and interest on bonds, this company has been compelled to borrow large sums of money, and it now owes a floating debt incurred for these purposes, including unpaid interest coupons, of upward of $3,300,000."

That each of said railways put the commission tariffs complained of in effect on its lines under protest and under coercion of the severe provisions relating to suits against it for damages and penalties should it refuse or fail to so put them in effect. That the number of suits to which they would otherwise daily become liable amounted to many hundred.

"The legislature has power to fix rates, and the extent of judicial interference is protection against unreasonable rates." *Railway Co.* v. *Wellman*, 143 U. S. 344, 12 Sup. Ct. Rep. 400. "The question of the reasonableness of a rate of charge for transportation by a railway company, involving, as it does, the element of reasonableness, both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination. If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law, and in violation of the constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits on their invested capital, the company is deprived of the equal protection of the laws." *Railway Co.* v. *Minnesota*, 134 U. S. 458, 10 Sup. Ct. Rep. 462.

If such deprivation is shown here, does it take place in the absence of an investigation by judicial machinery? It must be conceded that as between private parties and the railways no such investigation of the reasonableness of the rates is permitted by the railroad commission law of Texas, for that intent is expressed in section 5 in terms too comprehensive and plain to be modified by construction. Two of the members of the railroad commission are eminent lawyers. It may, I think, be fairly, if not conclusively, presumed that before the commission undertook the work of establishing rates they had the advice of the very able attorney general as to the sound construction of section 4 of said act; and, as defendants herein, said commissioners and attorney general cannot complain if I assume that the practical construction, which in the conscientious discharge of their public duties the commission have placed on section 4, is the sound construction.

The following is a copy of the notice which the commission issued and had addressed, and sent through the mails, to the general freight agent of each of the railroads of Texas:

"OFFICE OF RAILROAD COMMISSION OF TEXAS.

"AUSTIN, TEX., June 20, 1891.

"*General Freight Agent* ——— *Railroad*—DEAR SIR: In accordance with the requirements of section 4 of the act creating the railroad commission of Texas, passed at the regular session of the twenty-second legislature, and approved April 3, 1891, the railroad commission of Texas will, on Monday, July 6, 1891, begin and continue from day to day, until completed, the classification and subdivision of all freight and property, of whatsoever character, that may be transported over the railroads of this state, into such general or special classes or subdivisions as may be found necessary or expedient, and the fixing for each class or subdivision of freight a reasonable rate for each railroad, subject to this act, for the transportation of each of said subdivisions or classes; also that at the above-named time and place a special classification and rates of charges thereon of cotton, grain, lumber, and salt will be made. Your attention is also called to section 8 of the act aforesaid, which provides that, in all cases where the rates shall not have been fixed by the commission, no changes shall be made, except after ten days' notice to and consent of commission. Therefore the changing of any rates in force June 10, 1891, except after notice as above provided, and the consent of the commission, is unlawful.

"Please acknowledge the receipt of this notice, and oblige,

"JOHN H. REAGAN, Chairman.

"J. J. ARTHUR, Secretary."

At the date named in said notice representatives of most, if not all, of the railway companies in Texas appeared before the commission, in session at Austin, Tex. No proposed change in existing classification or rates was indicated by the commission, and no issue was submitted which could be either agreed to or made the subject of proof or suggestion by argument. The commission in their answer say:

"The said commission had just begun the investigation of the classification and rates of said roads in the state, and had at the date of said conference not determined either upon any classification or rates."

One of the counsel for the cross complainants, who was present before the commission at Austin on the said 6th of July, 1891, and the several following days, to answer for his road, describes that assize as "a sort of general experience meeting;" and another one of the counsel, who was also present for the same purpose, pictures it as a kind of Chautauqua class, where free lectures on the general subjects of railroad freights, classifications, and rates were invited from all comers, which could result in nothing, unless a Babel, with its confusion of tongues. The defendant commissioners say in their answer: "The said conference, beginning on July 6, 1891, lasted for several days, and all freight rates in Texas were discussed and considered;" and again: "Defendants aver that the session begun July 6, 1891, has never terminated or been adjourned at all, and that all the rates complained of in said bill, or which have ever been fixed by said commission, have been fixed at the session aforesaid;" and again: "Defendants further admit that said commission is proposing and proceeding to make and promulgate other rates and tariffs without other formal notice than that dated June 20, 1891."

The suggestion that the proceedings here indicated constitute "due process of law," within the meaning of the provisions of the constitution, or "an investigation by judicial machinery," within the meaning of the decisions of the supreme court, can hardly be seriously made by the sound lawyers who have appeared to resist these motions. And the subject is too grave for jest. *U. S.* v. *Lee,* 106 U. S. 196, 1 Sup. Ct. Rep. 240; *Poindexter* v. *Greenhow,* 114 U. S. 270, 5 Sup. Ct. Rep. 903, 962; *Railway Co.* v. *Minnesota,* 134 U. S. 418, 10 Sup. Ct. Rep. 462. *Jones* v. *Robbins,* 8 Gray, 329; *City of Louisville* v. *Cochran,* 82 Ky. 15.

It is, however, seriously urged that conceding that section 4 does not provide due process of law, as meant by the constitution, and that section 5 is unconstitutional, the railroad commission law, without section 5 and its related sections, and the work of the commission, may still stand, and the complainants be without legal ground for the relief they seek. This, however, is wholly inconsistent with the position assumed by the leading advocates of the commission in their public addresses to the people in the canvass now pending in Texas, of which, on a hearing in chambers, I may be permitted that far to take judicial notice. In at least one public address his excellency, our present governor, in discussing the subject of the Texas commission, and especially section 5 of the railroad commission law, certainly said in substance, with zeal and warmth and telling iteration, that section 5 was the heart of this law, and it and its related sections the life of the Texas railroad commission. And according to my most careful study of this law, in that respect and to that extent, his excellency's construction of the law was sound. The act is largely modeled after the interstate commerce act, into which, however, it seeks to infuse life by section 5 and its related sections. It is evident on the face of the law—as we know the fact to have been—that its framers were thoroughly conversant with, and kept steadily in their view, the decision of the supreme court in the Minnesota case, then but lately announced. The act appears with studious,

but with illogical, ingenuity to endeavor to contrive a due process of law that would, while the due process was proceeding, permit the doing of the will of the commissioners, however arbitrary and unreasonable their rates might be, and might eventually be proved to be. It was well known that the interstate commission did not possess or claim the power to enforce rates fixed by it, except thr ..gh the long-established courts of the country; and that the railroad commissions of other states, with perhaps one or two exceptions, did not have or claim the power to fix conclusive rates. It was evidently thought that all these were inefficient; that the commission would not meet the exigency of the hour if the reasonableness of its rates could be inquired into before being enforced; that with their organized guild of able lawyers, stationed or capable of being concentrated at each given point on their respective lines, the railroad managers would show small respect to the promulgations of this advisory committee, as they considered the commission would be if the reasonableness of its rates might in every case be questioned in the courts. Hence, the many and severe provisions for constraining the roads to submit to whatever rates the commission might impose until, by a new patent process, the roads could recover the right to hold up the shield of the constitution against unreasonable rates.

It clearly appears to me that every provision of this law that tends to thus enforce a compliance with the rates of the commission, whether they be reasonable or not, and every provision tending to embarrass or enabling the commissioners to embarrass such roads as may choose to invoke the protection of the constitution against the taking of their property without the due process of law, or denying them the equal protection of the law, is affected with the same vice that renders section 5 invalid. It follows from the views thus far expressed that these motions should be granted, and that the very many other most interesting questions presented in the record and in argument on this hearing are not material to be considered now. That the measure of complainants' and cross complainants' relief shall be adequate it is necessary that it should be as full as they have asked. And it is so ordered.

## THE ORDER.

*In the Circuit Court of the United States for the Western District of Texas—In Equity.*

No. 186. Original Bill. *The Mercantile Trust Co., Trustee Complainant,* against *The Texas and Pacific Railway Company, John H. Reagan, et al.*

Cross Bill. *The Texas and Pacific Railway Company, Complainant,* against *The Mercantile Trust Company, John H. Reagan, and others.*

The motions of complainants under the above-entitled original bill and cross bill, having come on to be heard upon the said original bill and cross bill, and upon the answers of the defendants to said original bill, and of the defendants, John H. Reagan, William P. McLean, L. L. Foster, and Charles A. Culberson, to said cross bill, and upon the affidavits on file, and the same having been argued by counsel for the respective parties, and the consideration having been had, it is now adjudged, ordered, and decreed:

(1) That until further order of this court, or of the judges hereof, the defendant the Texas & Pacific Railway Company be, and it is hereby, restrained from putting or continuing in effect the tariffs, circulars, or orders of the railroad commission of Texas, and each and all of them, described in the bill of complaint herein, and in Exhibit C thereto, and therewith filed, and from charging or continuing to charge the rates specified in said tariffs, circulars, orders, or either or any of them.

(2) It is further ordered, adjudged, and decreed that the defendants, the railroad commission of Texas, and the defendants John H. Reagan, Wm. P. McLean, and L. L. Foster, acting as said railroad commission of Texas, and their successors in office, and the defendant Charles A. Culberson, acting as attorney general of the state of Texas, be, and they are hereby, enjoined and restrained from instituting or authorizing or directing any others to institute any suit or suits, action or actions, against the said railway company for the recovery of any penalties under and by virtue of the provisions of said act of the legislature of the state of Texas, approved on the 3d day of April, 1891, or under or by virtue of any of the said tariffs, orders, or circulars of the said railroad commission of Texas, or any or either of them, or under and by virtue of the said act, and the said tariffs, orders, or circulars of said commission, or any or either of them combined; and restraining said defendants Reagan, McLean, and Foster, and the railroad commission of Texas, from certifying any copy or copies of any of said orders, tariffs, or circulars, or from delivering, or causing or permitting to be delivered, copies of any of said orders, tariffs, or circulars to the said Culberson, or any other party, and from furnishing the said Culberson, or any other party, any information of any character, for the purpose of inducing, enabling, or aiding him, or any other party, to institute or prosecute any suit or suits against the said railway company for the recovery of any penalty or penalties under the said act.

(3) It is further ordered, adjudged, and decreed that the said railroad commission of Texas and the said Reagan, McLean, and Foster be restrained from making, issuing, or delivering to the said railway company, or causing to be issued or delivered to it, any further tariff or tariffs, circulars or orders.

(4) It is further ordered, adjudged, and decreed that all other individuals, persons, or corporations be, and they are hereby, restrained from instituting or prosecuting any suit or suits against the said railway company for the recovery of any damages, overcharges, penalty or penalties, under or by virtue of the said act, or any of its provisions, or under or by virtue of the said tariffs, orders, or circulars of the said railroad commission of Texas, or any or either of them, or by virtue of the said act, and the said tariffs, orders, or circulars, or any or either of them combined.

A. P. McCORMICK, Circuit Judge, Fifth Circuit.

In chambers at Dallas, August 22, 1892.

The same order was made in each of the other cases.

### NOTE.

The railroad commission law, (Act April 3, 1891,) referred to in the opinion, is as follows:

Section 1. Be it enacted by the legislature of the state of Texas, that a railroad commission is hereby created, to be composed of three persons to be appointed by the governor, as follows: If the legislature be then in session, the governor shall, upon the taking effect of this act, or as soon thereafter as practicable, by and with the advice of the senate, if the legislature then be in session, appoint said commissioners; but, if the legislature be not in session, the governor shall make such appointments, and each commissioner so appointed shall hold his office until the second Monday after the inauguration of the next succeeding governor, and until his successor is appointed and qualified. Each succeeding governor shall, on the second Monday after his inauguration, or as soon thereafter as practicable, appoint said commissioners, who shall each

hold his office until the second Monday after the inauguration of the next succeeding governor, and until his successor is appointed and qualified.

(*a*) The persons so appointed shall be resident citizens of this state, and qualified voters under the constitution and laws, and not less than 25 years of age. No person shall be appointed as such commissioner who is directly or indirectly interested in any railroad in this state or out of it, or in any stock, bond, mortgage, security, or in the earning of any such road; and if such commissioner shall voluntarily become so interested his office shall become vacant; and if any railroad commissioner shall become so interested otherwise than voluntarily he shall, within a reasonable time, divest himself of such interest; failing to do this, his office shall become vacant.

(*b*) No commissioner hereunder shall hold any other office under the government of the United States or of this state, or of any other state government, and shall not while commissioner engage in any occupation or business inconsistent with his duties as such commissioner.

(*c*) The governor shall fill all vacancies in the office of commissioner by appointment, and the person so appointed shall fill out the unexpired term of his predecessor.

(*d*) Before entering upon the duties of his office, each of said commissioners shall take and subscribe to the oath of office prescribed in the constitution, and shall, in addition thereto, swear that he is not directly or indirectly interested in any railroad, nor in the bonds, stock, mortgages, securities, contracts, or earnings of any railroad, and that he will, to the best of his ability, faithfully and justly execute and enforce the provisions of this act, and all laws of this state concerning railroads, which shall be filed with the secretary of state.

(*e*) Each of said commissioners shall receive an annual salary of $4,000, payable in the same manner that salaries of other state officers are paid.

Sec. 2. The commissioners appointed shall meet at Austin, and organize and elect one of their number chairman of said commission. A majority of said commissioners shall constitute a quorum to transact business. Said commission may appoint a secretary at a salary of not more than $2,000 per annum, and may appoint not more than two clerks, at a salary of not more than $1,500 per annum each, and such other persons as experts as may be necessary to perform any duty that may be required of them by this act. The secretary shall keep full and correct minutes of all the transactions and proceedings of said commission, and perform such duties as may be required by the commission. The commission shall have power to make all needful rules for their government and for their proceedings. They shall be known collectively as "Railroad Commissioners of Texas," and shall have a seal, a star of five points, with the words "Railroad Commission of Texas" engraved thereon. They shall be furnished with an office in the capitol at Austin, and with necessary furniture, stationery, supplies, and all necessary expenses, to be paid for on the order of the governor. The commissioners, secretary, and clerks shall be entitled to receive from the state their actual traveling expenses, which shall include the cost only of transportation while traveling on the business of the commission, to be paid out on the order of the governor upon an itemized statement thereof, sworn to by the party who incurred the expense and approved by the commission.

(*a*) Said commissioners may hold sessions at any place in this state, when deemed necessary to facilitate the discharge of their duties.

Sec. 3. The power and authority is hereby vested in the railroad commission of Texas, and it is hereby made its duty, to adopt all necessary rates, charges, and regulations to govern and regulate railroad freight and passenger tariffs, the power to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this state, and to enforce the same by having the penalties inflicted as by this act prescribed, through proper courts having jurisdiction.

(*a*) The said commission shall have power, and it shall be its duty, to fairly and justly classify and subdivide all freight and property, of whatsoever character, that may be transported over the railroads of this state, into such general and special classes or subdivisions as may be found necessary and expedient.

(*b*) The commission shall have power, and it shall be its duty, to fit to each class or subdivision of freight a reasonable rate for each railroad subject to this act, for the transportation of each of said classes and subdivisions.

(*c*) The classifications herein provided for shall apply to and be the same for all railroads subject to the provisions of this act.

(*d*) The said commission may fix different rates for different railroads, and for different lines under the same management, or for different parts of the same lines, if found necessary to do justice, and may make rates for express companies different from the rates fixed for railroads.

(*e*) The said commission shall have power, and it shall be its duty, to fix and establish, for all or any connecting lines of railroad in this state, reasonable joint rates of freight charges for the various classes of freight and cars that may pass over two or more lines of such railroads.

(*f*) If any two or more connecting railroads shall fail to agree upon a fair and just division of the charges arising from the transportation of freights, passengers, or cars

over their lines, the commission shall fix the *pro rata* part of such charges to be received by each of said connecting lines.

(*g*) Until the commission shall make the classifications and schedules of rates as herein provided for, and afterwards, if they deem it advisable, they may make partial or special classifications for all or any of the railroads subject hereto, and fix the rates to be charged by such roads therefor, and such classifications and rates shall be put into effect in the manner provided for general classifications and schedules of rates.

(*h*) The commission shall have power, and it shall be its duty, from time to time, to alter, change, amend, or abolish any classification or rate established by it when deemed necessary; and such amended, altered, or new classifications or rates shall be put into effect in the same manner as the originals.

(*i*) The commission may adopt and enforce such rules, regulations, and modes of procedure as it may deem proper to hear and determine complaints that may be made against the classifications or the rates, the rules, regulations, and determinations of the commission.

(*j*) The commission shall make reasonable and just rates of charges for each railroad subject hereto for the use or transportation of loaded or empty cars on its road; and may establish for each railroad, or for all railroads alike, reasonable rates for the storing and handling of freight, and for the use of cars not unloaded after forty-eight hours' notice to the consignee, not to include Sundays.

(*k*) The commission shall make and establish reasonable rates for the transportation of passengers over each or all of the railroads subject hereto, which rates shall not exceed the rates fixed by law. The commission shall have power to prescribe reasonable rates, tolls, or charges for all other services performed by any railroad subject hereto.

(*l*) It shall be the duty of each and every railway subject to this act to provide and maintain adequate, comfortable, and clean depots and depot buildings at its several stations for the accommodation of passengers, and said depot buildings shall be kept well lighted and warmed for the comfort and accommodation of the traveling public; and all such roads shall keep and maintain adequate and suitable freight depots and buildings for the receiving, handling, storing, and delivering of all freight handled by such roads: provided, that this shall not be construed as repealing any existing laws on the subject.

Sec. 4. Before any rates shall be established under this act, the commission shall give the railroad company to be affected thereby ten days' notice of the time and place when and where the rates shall be fixed, and said railroad company shall be entitled to be heard at such time and place, to the end that justice may be done, and it shall have process to enforce the attendance of witnesses. All process herein provided for shall be served as in civil cases.

(*a*) The commission shall have power to adopt rules to govern its proceedings, and to regulate the mode and manner of all investigations and hearings of railroad companies and other parties before it in the establishment of rates, orders, and other acts required of it under this law, providing no person desiring to be present at any such investigations by said commission shall be denied admission.

(*b*) The chairman and each of the commissioners, for the purposes mentioned in this act, shall have power to administer all oaths, certify to all official acts, and to compel the attendance of witnesses and the production of papers, waybills, books, accounts, documents, and testimony, and to punish for contempt as fully as is provided by law for the district or county court.

Sec. 5. In all actions between private parties and railway companies brought under this law, the rates, charges, orders, regulations, and classifications prescribed by said commission before the institution of such action shall be held conclusive, and deemed and accepted to be reasonable, fair, and just, and in such respects shall not be controverted therein until finally found otherwise in a direct action brought for that purpose in the manner prescribed by sections 6 and 7 thereof.

Sec. 6. If any railroad or other party at interest be dissatisfied with the decision of any rate, classification, rule, charge, order, act, or regulation adopted by the commission, such dissatisfied company or party may file a petition setting forth the particular cause or causes of objection to such decision, act, rule, charge, classification, or order, or to either or all of them, in a court of competent jurisdiction in Travis county, Tex., against said commission as defendant. Said action shall have precedence over all other causes on the docket of different nature, and shall be tried and determined as other civil causes in said court. Either party to said action may appeal to the appellate court having jurisdiction of said cause, and said appeal shall be at once returnable to said appellate court at either of its terms, and said action so appealed shall have precedence in said appellate court of all causes of a different character therein pending: provided that, if the court be in session at the time such right of action accrues, the suit may be filed during such term, and stand ready for trial after ten days' notice.

Sec. 7. In all trials under the foregoing section, the burden of proof shall rest upon the plaintiff, who must show by clear and satisfactory evidence that the rates, regulations, orders, classifications, acts, or charges complained of are unreasonable and unjust to it or them.

Sec. 8. The said commission shall, so soon as the classifications and schedules of rates herein provided for are prepared by them, furnish each railroad, subject to the provisions of this act, with a complete schedule in suitable form, showing the classification of freight made by them, and the rates fixed by said commission to be charged by such road for the transportation of each class of freight, and shall cause a certified copy of such classification and schedule of rates to be delivered to each of said railroads at its principal office in this state, if it has such office in this state, and, if not, then to any agent of said company in this state, which said schedule, rules, and regulations shall take effect at the date which may be fixed by said commission, not less than twenty days. Each of said railroad companies shall cause said schedules to be printed in type of a size not less than pica, and shall have the same posted up in a conspicuous place at each of its depots, so as to be inspected by the public. Said commission may at any time abolish, alter, or in any manner amend the said schedules, or abolish or amend any such regulations, and in that event certified copies of the schedules, rules, or regulations, showing the changes therein, shall be delivered to each road as herein specified. In all cases where the rates shall not have been fixed by the commission, no changes shall be made except after ten days' notice to and consent of the commission.

Sec. 9. Any person, firm, corporation, or association, or any mercantile, agricultural, or manufacturing association, or any body politic, or municipal organization, complaining of anything done or omitted to be done by any railroad subject hereto, in violation of any law of this state or the provisions of this act, (for which penalty is provided,) may apply to said commission in such manner and under such rules as the commission may prescribe; whereupon, if there shall appear to the commission to be any reasonable grounds for investigating such complaint, it shall give at least five days' notice to such railroad of such charge and complaint, and call upon said road to answer the same at a time and place to be specified by the commission. The commission shall investigate and determine such complaint under such rules and modes of procedure as it may adopt. If the commission find that there has been a violation, it shall determine if the same was willful; if it finds that such violation was not willful, it may call upon said road to satisfy the damage done to the complainant thereby, stating the amount of such damage, and to pay the cost of such investigation; and if the said railroad shall do so within the time specified by the commission, there shall be no prosecution by the state; but if said railroad shall not pay said damage and cost within the time specified by said commission, or if the commission find such violation to be wilful, it shall institute proceedings to recover the penalty for such violation and the cost of such investigation. All such complaints shall be made in the name of the state of Texas upon the relation of such complainant. All evidence taken before said commission in the investigation of any such complaint, when reduced to writing and signed and sworn to by the witness, may be used by either party,—the state, complainant, or the railroad company,—in any proceeding against such railroad involving the same subject-matter: provided, further, that the commissioners may require the testimony so taken before them to be reduced to writing when they may deem it necessary, or when requested to do so by either party to such proceedings, and a certified copy under the hand and seal of said commission shall be admissible in evidence upon the trial of any cause or proceeding growing out of the same transaction against such railroad, involving the same subject-matter and between the same parties. The provisions of this section shall not abridge nor affect the right of any person to sue for any penalty that may be due him under the provisions of this act or any other law of this state.

Sec. 10. The commissioners, or either of them, or such persons as they employ therefor, shall have the right, at such times as they may deem necessary, to inspect the books and papers of any railroad company, and to examine under oath any officer, agent, or employe of such railroad in relation to the business and affairs of the same. If any railroad shall refuse to permit the commissioners, or either of them, or any person authorized thereto, to examine its books and papers, such railroad company shall, for each offense, pay to the state of Texas not less than $125 nor more than $500 for each day it shall so fail or refuse: provided, that any person, other than one of said commissioners, who shall make any such demands, shall produce his authority, under the hand and seal of said commission, to make such inspection.

(*a*) Any officer, agent, or employe of any railroad company who shall, upon proper demand, fail or refuse to exhibit to the commissioners, or either of them, or any person authorized to investigate the same, any book or paper of such railroad company which is in the possession or under the control of such officer, agent, or employe, shall be deemed guilty of a misdemeanor, and upon conviction in any court having jurisdiction thereof shall be fined for each offense a sum not less than $120, and not [to] exceed $500.

Sec. 11. The commission shall ascertain as early as practicable the amount of money expended in construction and equipment per mile of every railway in Texas: the amount of money expended to procure the right of way, and the amount of money it would require to reconstruct the roadbed, track, depots, and transportation, and to replace all the physical properties belonging to the railroad. It shall also ascertain the

outstanding bonds, debentures, and indebtedness, and the amount, respectively, thereof; when issued, and rate of interest; when due; for what purposes issued; how used; to whom issued; to whom sold, and the price in cash, property, or labor, if any, received therefor; what became of the proceeds; by whom the indebtedness is held; the amount purporting to be due thereon; the floating indebtedness of the company; to whom due, and his address; the credits due on it; the property on hand belonging to the railroad company; and the judicial or other sales of said road, its property or franchise, and the amounts purporting to have been paid, and in what manner paid therefor. The commission shall also ascertain the amounts paid for salaries to the officers of the railroad and the wages paid its employes. For the purpose in this section named the commission may employ sworn experts to inspect and assist them when needed, and from time to time, as the information required by this section is obtained, it shall communicate the same to the attorney general by report, and file a duplicate thereof with the comptroller for public use, and said information shall be printed from time to time in the annual report of the commission.

Sec. 12. The said commission shall cause to be prepared suitable blanks, with questions calculated to elicit all information concerning railroads, and as often as it may be necessary furnish blanks to each railroad company. Any railroad company receiving from the commission any such blanks shall cause said blanks to be properly filled out, so as to answer fully and correctly each question therein propounded, and, in case they are unable to answer any question, they shall give a satisfactory reason for the failure; and the said answers, duly sworn to by the proper officer of said company, shall be returned to said commission at its office in the city of Austin within thirty days from the receipt thereof.

(a) If any officer or employe of a railroad company shall fail or refuse to answer any questions therein propounded, or give a false answer to any such question where the fact inquired of is within his knowledge, or shall evade the answer to any such questions, such person shall be guilty of a misdemeanor, and shall on conviction thereof be fined for each day he shall fail to perform such duty after the expiration of the time aforesaid a penalty of $500, and the commission shall cause a prosecution therefor in the proper court; and a penalty of a like amount shall be recovered from the company when it appears that such person acted in obedience to its direction, permission, or request in his failure, evasion, or refusal. Said commission shall have the power to prescribe a system of bookkeeping to be observed by all railroads subject hereto, under the penalties prescribed in this section.

(b) The said commission shall make and submit to the governor annual reports containing a full and complete account of the transactions of their office, together with the information gathered by such commission as herein required, and such other facts, suggestions, and recommendations as may be by them deemed necessary, which report shall be published as the reports of the heads of departments.

(c) The said commission shall have power, and it is hereby made its duty, to investigate all through freight rates on railroads in Texas; and when the same are, in the opinion of the commission, excessive, or levied or laid in violation of the interstate commerce law, or the rules and regulations of the interstate commerce commission, the officials of the railroads are to be notified of the facts and requested to reduce them, or make the proper corrections, as the case may be. When the rates are not changed, or the proper corrections are not made according to the request of the commission, the latter is instructed to notify the interstate commerce commission, and to apply to it for relief.

Sec. 13. The said commission, in making any examination or investigation provided in this act, shall have power to issue subpœnas for the attendance of witnesses by such rules as they may prescribe. Each witness who shall appear before the commission by order of the commission, at a place outside of the county of his residence, shall receive for his attendance $1 per day and 3 cents per mile, traveled by the nearest practicable route, in going to and returning from the place of meeting of said commission, which shall be ordered paid by the comptroller of public accounts upon the presentation of proper vouchers, sworn to by such witness, and approved by the chairman of the commission: provided, that no witness shall be entitled to any witness fees or mileage who is directly or indirectly interested in any railroad in this state or out of it, or who is in any wise interested in any stock, bond, mortgage, security, or earnings of any such road, or who shall be the agent or employe of such road, or an officer thereof, when summoned at the instance of such railroad; and no witness furnished with free transportation shall receive pay for the distance he may have traveled on such free transportation. In case any witness shall fail or refuse to obey such subpœna, said commission may issue an attachment for said witness, directed to any sheriff or any constable of the state of Texas, and compel him to attend before the commission and give his testimony upon such matters as shall be lawfully required by them. If a witness, after being duly summoned, shall fail or refuse to attend or to answer any question propounded to him, and which he would be required to answer if in court, the commission shall have the power to fine and imprison such witness for contempt, in the same manner that a judge of the district court might do under similar circumstances. The claim that any such testimony may tend to criminate the person giving it

shall not excuse such witness from testifying, but such evidence or testimony shall not be used against such person on the trial of any criminal proceeding: provided, the commission shall in all cases have the right, in its discretion, to issue proper process and take depositions instead of compelling personal attendance of witnesses. The sheriff or constable executing any process issued under the provisions of this section, or under any other provisions of this bill, shall receive such compensation as may be allowed by the commission, not to exceed fees as now prescribed by law for similar services.

Sec. 14. If any railroad company subject to this act, or its agent or officer, shall hereafter charge, collect, demand, or receive from any person, company, firm, or corporation a greater rate, charge, or compensation than that fixed and established by the railroad commission for the transportation of freight, passengers, or cars, or for the use of any car on the line of its railroad, or any line operated by it, or for receiving, forwarding, handling, or storing any such freight or cars, or for any other service performed or to be performed by it, such railroad company, and its said agent and officer, shall be deemed guilty of extortion, and shall forfeit and pay to the state of Texas a sum not less than $100 nor more than $5,000.

Sec. 15. If any railroad subject hereto, directly or indirectly, or by any special rate, rebate, drawback, or other device, shall charge, demand, collect, or receive from any person, firm, or corporation a greater or less compensation for any service rendered or to be rendered by it than it charges, demands, collects, or receives from any other person, firm, or corporation for doing a like and contemporaneous service, such railroad shall be deemed guilty of unjust discrimination, which is hereby prohibited.

(*a*) It shall also be an unjust discrimination for any such railroad to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or to subject any particular description of traffic to any undue or unreasonable prejudice, delay, or disadvantage, in any respect whatsoever.

(*b*) Every railroad company which shall fail or refuse, under such regulations as may be prescribed by the commission, to receive and transport, without delay or discrimination, the passengers, tonnage, and cars, loaded or empty, of any connecting line of railroad, and every railroad which shall, under such regulations as may be prescribed by the commission, fail and refuse to transport and deliver, without delay or discrimination, any passengers, tonnage, or cars, loaded or empty, destined to any point on or over the line of any connecting line of railroad, shall be deemed guilty of unjust discrimination: provided, perishable freights of all kinds and live stock shall have precedent of shipment.

(*c*) It shall also be an unjust discrimination for any railroad subject hereto to charge or receive any greater compensation in the aggregate for the transportation of like kind of property or passengers for a shorter than for a longer distance over the same line: provided, that upon application to the commission any railroad may in special cases, to prevent manifest injury, be authorized by the commission to charge less for longer than for shorter distances for transporting persons and property, and the commission shall from time to time prescribe the extent to which such designated railroad may be relieved from the operations of this provision: provided, that no manifest injustice shall be imposed upon any citizen at intermediate points: provided, further, that nothing herein shall be so construed as to prevent the commission from making what are known as "group rates" on any line or lines of railroad in this state.

(*d*) Any railroad violating any provision of this section shall be deemed guilty of unjust discrimination, and shall for each offense pay to the state of Texas a penalty of not less than five hundred dollars, nor more than five thousand dollars.

(*h*) Nothing herein shall prevent the carriage, storage, or handling of freight free or at reduced rates for the state, or for any city, county, or town, government, or for charitable purposes, or to and from fairs and expositions for exhibition thereof, or the free carriage of destitute and indigent persons, or the issuance of mileage or excursion passenger tickets; nor to prevent railroads from giving free transportation to ministers of religion, or free transportation to the inmates of hospitals, eleemosynary and charitable institutions, and to the employes of the agricultural and geological departments of this state, or to peace officers of this state; and nothing herein shall be construed to prevent railroads from giving free transportation to any railroad officers, agents, employes, attorneys, stockholders, or directors, or to the railroad commissioners, their secretary, clerks, and employes, herein provided for, or to any person not prohibited by law: provided, they, or either of them, shall not receive from the state mileage when such pass is used.

Sec. 16. Any officer or agent of any railroad subject to this act who, by means of false billing, false classification, false weight, or by any other device, shall suffer or permit any person or persons to obtain transportation for property at less than the regular rates then in force on such railroad, or who, by means of false billing, false classification, false weighing, or by any device whatever, shall charge any person, firm, or corporation more for the transportation of property than the regular rates, shall be guilty of a misdemeanor, and on conviction thereof fined in a sum of not less than $100 nor more than $1,000.

Sec. 17. In case any railroad subject to this act shall do, cause to be done, or permit to be done, any matter, act, or thing in this act prohibited or declared to be unlawful;

or shall omit to do any act, matter, or thing herein required to be done by it, such railroad shall be liable to the person or persons, firm or corporation, injured thereby, for the damages sustained in consequence of such violation; and in case said railroad company shall be guilty of extortion or discrimination as by this act defined, then, in addition to such damages, such railroad shall pay to the person, firm, or corporation injured thereby a penalty of not less than $125 nor more than $500, to be recovered in any court of competent jurisdiction in any county into or through which such railroad may run: provided, that such road may plead and prove as a defense to the action for said penalty that such overcharge was unintentionally and innocently made through a mistake of fact: provided, that any such recovery as herein provided shall in no manner affect a recovery by the state of a penalty provided for such violation.

Sec. 18. If any railroad, as aforesaid, shall willfully violate any other provisions of this act, or shall do any other act herein prohibited, or shall fail or refuse to perform any other duty enjoined upon it for which a penalty has not herein been provided, for every such act of violation it shall pay the state of Texas a penalty of not more than five thousand dollars.

Sec. 19. All of the penalties herein provided, except as provided in section 17, shall be recovered, and suits thereon shall be brought, in the name of the state of Texas, in the proper court having jurisdiction thereof, in Travis county, or in any county to or through which such railroad may run, by the attorney general or under his direction; and the attorney bringing such suit shall receive a fee of fifty dollars for each penalty recovered and collected by him, and ten per cent. of the amount collected, to be paid by the state. In all suits arising under this act, the rules of evidence shall be the same as in ordinary civil actions, except as otherwise herein provided. All fines and penalties recovered by the state under this act shall be paid into the treasury of the state.

Sec. 20. Upon application of any person, the commission shall furnish certified copies of any classification, rates, rules, regulations, or orders, and such certified copies, or printed copies published by authority of the commission, shall be admissible in evidence in any suit, and sufficient to establish the fact that any charge, rate, rule, order, or classification therein contained, and which may be in issue in the trial, is the official act of commission. A substantial compliance with the requirements of this act shall be sufficient to give effect to all the classifications, rates, charges, rules, regulations, requirements, and orders made and established by the commission, and none of them shall be declared inoperative for any omission of a technical matter in the performance of such act.

Sec. 21. It is hereby made the duty of such railroad commission to see that the provisions of this act, and all laws of this state concerning railroads, are enforced and obeyed, and that violations thereof are promptly prosecuted, and penalties due the state therefor recovered and collected. And said commission shall report all such violations, with the facts in their possession, to the attorney general or other officer charged with the enforcement of the laws, and request him to institute the proper proceedings; and all suits between the state and any railroad shall have precedence in all courts over all other suits pending therein.

(a) It shall be the duty of the commission to investigate all complaints against railroad companies subject hereto, and to enforce all laws of this state in reference to railroads. But any two connecting railroads may enter into a contract whereby any part or all of the passengers, freight, or cars, empty or loaded, hauled or transported by one, and destined to points on or beyond the line of the other, shall be delivered to, received and transported by, the other; which contract, however, shall be submitted to the railroad commission for examination and approval, and when so approved by the commission the same shall be binding; but, if the said contract be not approved by the commission, the same shall be void: provided, that any connecting line delivering freight to the owner or consignee of such freight may be sued by the owner thereof in the county where the freight is delivered, for any damage that may be done to such freight in its transportation.

Sec. 22. The terms "road," "railroad," "railroad companies," and "railroad corporations," as used herein, shall be taken to mean and embrace all corporations, companies, individuals, and associations of individuals, their lessees or receivers, appointed by any court whatsoever, that may now or hereafter own, operate, manage, or control any railroad or part of a railroad in this state, and all such corporations, companies, and associations of individuals, their lessees or receivers, as shall do the business of common carriers on any railroad in this state.

(a) The provisions of this act shall be construed to apply to and affect only the transportation of passengers, freight, and cars between points within this state; and this act shall not apply to street railways, nor suburban or belt lines of railways, in or near cities and towns.

(b) It shall be the duty of the commission to see that upon every railroad and branch of same carrying passengers for hire in this state there shall run at least one train a day, (Sundays excepted,) upon which passengers shall be hauled, and the commission shall have no power to relax this provision.

Sec. 23. This act shall not have the effect to release or waive any right of action by the state or any person for any right, penalty, or forfeiture which may have arisen, or may hereafter arise, under any law of this state; and all penalties accruing under

this act shall be cumulative of each other, and a suit for or recovery of one shall not be a bar to the recovery of any other penalty; and all laws and parts of laws in conflict with this act are hereby repealed.

Sec. 24. The fact that there is no adequate and sufficient laws for the regulation of railroads in the transportation of freight and passenger traffic, and the near approach of the close of the present session, creates an imperative public necessity and an emergency, necessitating the suspension of the constitutional rule requiring bills to be read on three several days, and it is so suspended, and that this act take effect and be in force from and after its passage, and it is so enacted.