CARTER et al. v. FORTNEY et al.

(Circuit Court, N. D. West Virginia. May 25, 1909.)

1. INJUNCTION (§ 104*)—CONSPIRACY TO PREVENT OPERATION OF MINE—RIGHT OF BONDHOLDERS TO MAINTAIN SUIT.

Holders of bonds of a coal company secured by mortgage on its property, the value of which depends solely on the ability of the company to mine and market the coal in place thereon, have such an interest in the property that they may maintain a suit in equity to enjoin former employés of the company who went out on a strike and others conspiring with them from illegally preventing the operation of the mines by threatening and intimidating the company's employés and others who wish to become employés, where it is alleged that without such operation the company cannot pay the interest on its bonds or the principal when it matures.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 104.*]

2. INJUNCTION (§ 114*)—CONSPIRACY TO PREVENT OPERATION OF MINES—RIGHT OF BONDHOLDERS TO MAINTAIN SUIT.

Such bondholders are not required to apply to the trustee who holds the mortgage to bring such suit, which is outside of the terms of his trust; but, being the principals in interest, they may protect their rights by direct suit in their own names.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 114.*]

3. INJUNCTION (§ 118*)—CONSPIRACY TO PREVENT OPERATION OF MINES—RIGHT OF BONDHOLDERS TO MAINTAIN SUIT.

Neither are such bondholders required to allege and show a demand on the company to bring such suit and its refusal, having a distinct interest of their own which they are entitled to protect.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 118.*]

4. INJUNCTION (§ 114*)—CONSPIRACY TO PREVENT OPERATION OF MINES—SUIT BY BONDHOLDERS—PARTIES.

To a suit by bondholders of a coal company to enjoin striking employés and others conspiring with them from illegally interfering with and preventing the working of the company's mines by threatening and intimidating its employés, which operation of its mines it is alleged is necessary to enable the company to pay the interest on complainant's bonds as it matures, the company is not a necessary party.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 114.*]

In Equity. On demurrer to bill.

Melville H. Carter and three other citizens of Maryland have filed their bill against Osburn Fortney and 33 other individual citizens of West Virginia, in which they charge the Merchants' Coal Company to be a West Virginia corporation, the owner of valuable coal lands in Preston county, said state, and operating a coal mining plant at Tunnelton in said county, having mine openings, tipples, miners' houses, electric mining machinery, and a capacity for over 200 mine workers; that it has valuable existing contracts to furnish coal to contractors therefor, which it is bound to fill or lose and be held liable in damages for the breach, besides loss of profits, one of which is with the Baltimore & Ohio Railroad Company to furnish large quantities of coal necessary to supply its locomotives in continuing operation over its road; that about the last of March, 1908, the coal market becoming depressed and the price of coal being low, the coal company notified its miners of a 10 per cent. reduction in wages, which reduction its miners refused to accept, and the company closed down its mines until August, 1908, when it decided to again commence operation, offering its miners employment at the reduced wage, which they again refused to accept; that when the company attempted to start work the former employés and miners interfered with the operation and with those em-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ployés and miners who went to work, and thereupon the company again closed its mines until the last week in December, 1908, when it again started operation; that many former miners and employés went back to work, but a great number refused to do so, creating the necessity on the part of the company of bringing in from other localities other miners desirous of working for the wage offered; that immediately after this last commencement of operation in December, 1908, a large number of former employés, with others who had not been employed, colluded, conspired, and combined together for the express purposes of preventing the company from securing the services of other miners, of securing those at work to quit such service, to prevent the company from operating its mines, and to prevent it from fulfilling its contracts of sale of coal; that these conspirators included the defendants named and others unknown, and that, in pursuance of their purposes and conspiracy, they, by threats, menaces, insulting language, jeers, and hootings, caused many to quit work and intimidated others desiring to work from doing so; that such threats and menaces were being carried on to an extent necessarily requiring the company to keep guards and officers upon its property to prevent injury to its managers, superintendents, employés, and its property; that the miners at work are met on the streets by defendants and their co-conspirators, driven from the sidewalks to the streets, are threatened, menaced, jeered, hooted at, called "blacklegs," "yellow dogs," "blacksheep," "scabs," other names too vile to be written, are stoned on the streets, assaulted as they go to and from work, their houses have been fired into with guns, stones thrown through their windows and at members of their families in broad daylight on the public streets of the town; that deputy sheriffs employed to watch over the company's property and to keep the peace are jeered, hooted at, threatened, and no assistance is rendered by the authorities of the town in preservation of order; that these conspirators rush to every passenger train stopping in the town in great numbers and endeavor, forcibly and otherwise, to prevent persons alighting from such trains who seem to be seeking employment with the company, and by threats and menaces seek to prevent those alighting from engaging in the employment of the company; that they display large banners, at the arrival of trains, warning all persons not to engage in the employment of the coal company, have gone masked at night to the engine room of the company and delivered to its firemen a letter notifying them that they would be killed if they did not cease working for the company; that in consequence of all these acts the company has been prevented from employing more than one-half of the miners and employés to whom it could give work and who are willing and anxious to work if properly protected. Specific threats are set forth, and it is charged that the existing conditions have become unbearable, and "that, by reason of the conduct of defendants and their co-conspirators, the property of said coal company is in jeopardy and liable to be destroyed and greatly damaged, and great loss incurred by its being unable to operate its mines, or to operate them fully, and that the lives of persons now employed by said coal company, and those who come seeking employment, are in danger at the hands of said defendants and their co-conspirators, and that the town officers as aforesaid will render practically no assistance, and the county officers are unable to cope with the situation."

It is then alleged that the company's property is worth from $250,000 to $500,000, the sole value of which consists in its being able to mine, ship, and sell coal at a profit, which it cannot do so long as such conspiracy is effectual, as it now is, and great loss and damage will be incurred if mining operation has to be discontinued; that the company under such conditions will not be able to meet its obligations and the interest thereon; that plaintiffs are large creditors of the coal company, holding bonds against it secured by a mortgage, interest upon which is payable semiannually and the principal after a period of years. It is charged that the defendants are wholly insolvent; that the coal company has taken no sufficient legal steps to restrain the unlawful conspiracy; that its property is being damaged and the value thereof largely destroyed, and great danger and loss threatened plaintiffs as such bondholding lien creditors. An injunction is prayed against defendants and all others conspiring with them to restrain them from interfering with the company's mining operation, its officers and employés, and from engaging in the various acts of threatening, menacing, intimidating, and assaulting the company's of-

ficers and employés and miners on account of their service with the company; from picketing the property of the company, or from by unlawful means preventing others from entering the service of the company. A hearing upon the motion for injunction and a temporary restraining order was granted. Certain of the defendants have appeared and entered their demurrer to the bill, in which are assigned as grounds:

First. That the said plaintiffs have not shown by their said bill that they have any such right or interest in the contract of employment existing between the Merchants' Coal Company of West Virginia, a corporation, and the men engaged by said Merchants' Coal Company to work in and about its mine and coal plant, as entitles them to the relief by said bill prayed.

Second. That it appears from said bill that there is no privity of contract between said plaintiffs and the men in the employ of the said Merchants' Coal Company, whereby said employés are working for the said Merchants' Coal Company, as enables the said plaintiffs to invoke the aid of a court of equity in the protection of the contractual rights of said Merchants' Coal Company, existing between it and its employés, or such persons as it seeks to bring into its employment.

Third. That it does not appear from said bill that any sufficient effort has been made on the part of the said plaintiffs or any of them to induce the said Merchants' Coal Company to institute a suit to invoke the aid of a court of equity to protect it in its contractual rights and relations existing between it and its employés or other persons whom it is seeking to bring into its employment.

Fourth. That there are not proper parties to said bill, in this: That the said Merchants' Coal Company, a corporation, named in said bill, is directly interested in the contract existing between it and its employés, and that this court can pronounce no proper decree affecting the rights of the parties under such contract in the absence of the said Merchants' Coal Company, the only party to such contract directly interested in its enforcement except the employés engaged to work for said company under and by virtue of said contract.

Fifth. That it does not appear from said bill that the said defendants or any of them are seeking to injure or destroy the property, or any part thereof, mentioned in the said bill upon which the plaintiffs claim a lien by virtue of a deed of trust or mortgage existing thereon given to secure certain bonds, a part of which bonds, as shown by said bill, is held by the plaintiffs.

Sixth. That it is not shown by said bill, by appropriate allegation of facts, that the plaintiffs, or any of them, will suffer irreparable injury by reason of any of the matters and things in said bill set forth and averred.

Seventh. That it appears from said bill that the plaintiffs have ample security for the payment of the bonds which they hold, by virtue of the deed of trust or mortgage upon the property described in said bill, and that it does not appear that they are interested in the output of the coal from the mines of the Merchants' Coal Company; that they have not contracted for the purchase of said coal, and have no such connection with the mining and sale of said coal as to give them any right or interest in any existing contract between the Merchants' Coal Company and its employés for the work to be done in and about said mines in the operation of mining and shipping coal therefrom.

Eighth. That the plaintiffs have made no such showing by their said bill as entitles them to relief in equity relating to the contractual rights of the debtor, the said Merchants' Coal Company of West Virginia, because it clearly appears from the bill that the right of suit, if any exists, but which these defendants protest does not exist, belongs to the said Merchants' Coal Company, a corporation, and not to the said plaintiffs or any of them, as it nowhere appears from the said bill that the said corporation has refused to come into a court of equity for the purpose of enjoining these defendants because of the acts and doings by them alleged in the said bill to have been committed and threatened to be committed.

Ninth. That it nowhere appears in said bill that the plaintiffs have exhausted all the means within their reach to obtain through, by, and in the name of the said corporation, the Merchants' Coal Company, redress for their alleged grievances, or that the said corporation has declined to take action in conformity to their wishes touching the matters and things in said bill contained.

170 F.—30

Tenth. That it ought to be made to appear from said bill that the suit of the plaintiffs is not a collusive one to confer on a court of the United States jurisdiction of a case of which it would not otherwise have cognizance, inasmuch as this suit is within the spirit of rule of practice 94 adopted for and applied by courts of equity of the United States.

This demurrer has been argued and submitted.

P. J. Crogan, for plaintiffs.

Charles E. Hogg, for defendants.

DAYTON, District Judge (after stating the facts as above). It is my purpose to dispose of this demurrer as briefly as possible, and to abstain from any expression touching the facts involved. The demurrer admitting the allegations of the bill to be true justify me in giving them construction liberal to the interests of the complainants without in any manner, in case the demurrer is overruled, prejudicing judgment upon final hearing when the evidence shall disclose to what extent these allegations are sustained by the facts. It seems to me that this demurrer substantially involves these propositions:

First, lack of interest in plaintiffs: (a) Because the object of the bill is alleged to be to protect the Merchants' Coal Company in a contract made by it with its employés, to which the plaintiffs are not parties. (b) Because the bill alleges the interest of the plaintiffs to be solely a bonded or trust indebtedness of the company owned by them of $24,000 in the aggregate, with no allegation that the company's bonded indebtedness exceeds this sum, while the value of its property is alleged to be from $250,000 to $500,000, whereby is clearly shown that no danger of irreparable injury to plaintiffs' interests is apparent. (c) Because the plaintiffs, as bondholders of the coal company, secured by mortgage on its property, given to trustees, cannot maintain action in their own name without showing that the trustees have refused to bring an action. (d) Because the bill contains no sufficient allegation that the plaintiffs have applied to the company to bring suit to protect its own interests and thereby those of these plaintiffs.

Second, for want of parties. No decree can be entertained in the cause that does not directly affect the business and property rights of the coal company, therefore it is a necessary party.

Considering these, it is hardly necessary now to say that injunction will be granted "where the members of a labor organization, or other employés, conspire unlawfully to interfere with the management or business of another, and to compel the adoption of a particular scale of wages, by congregating riotously and in large numbers in and near the place of business of such other person, and for the purpose of preventing other laborers from entering into such other person's employment or remaining in such employment, by intimidation, consisting in physical force or injury, either actual or threatened, to person or property." Hogg, Eq. Principles, 387, § 278.

Such acts on the part of employés are common results of a strike on their part. A strike may be entirely legal where it is a voluntary refusal on the part of such employés to work for their employer because of conditions existing and his refusal to correct the same in accord with their lawful demands. On the other hand, it becomes illegal if it be the result of an agreement depriving those engaged in it

of their liberty of action, and it becomes criminal if it be a part of a combination for the purpose of injuring or molesting either masters or men.    Arthur v. Oakes, 63 Fed. 310, 11 C. C. A. 209, 25 L. R. A. 414.

On the other hand, there may be a combination of persons not employés created "for the purpose of injuring or destroying the business of another, either by efforts to prevent, by unlawful means, the sales of his products to the public or the use of some particular thing in his business, or by materially lessening or entirely stopping the manufacture of his products, through the loss or want of the necessary or proper employés, vehicles, or machinery, the lack whereof is caused or brought about by the illegal acts of such combination, or by the union of both of these unlawful and unwarranted agencies operating at the same time upon the business of such other person." Such combination is known as a "boycott," and is condemned alike by the common law and modern decisions as illegal.    Hopkins v. Okley Stave Co., 83 Fed. 912, 28 C. C. A. 99; Hogg's Eq. Principles, 387, § 279.

The allegations of this bill, in effect, charge a conspiracy involving the elements of both the strike and of the boycott.    It is charged that the employés of the company in March, 1908, refused to accept a wage reduction, and, as they had right to do, surrendered their employment, and the company in consequence ceased operation; that in August following, when it sought to resume work, upon the continued refusal of its old employés to accept the reduction and upon their interference with the operation, the company again shut down and remained so until the last of December.    Thus a period of nine months substantially elapsed during which these men were not in the service of this company and could not be considered its employés in any sense of the term.    It is then charged in effect that these defendants, some of whom had formerly worked for the company and some had not, formed a combination or conspiracy, with others unknown, to prevent this company from resuming operations, from mining its coal, and complying with its contracts to deliver the same to its customers, and thereby destroy its business and the value of its property; that this is sought to be accomplished by menaces, threats, assaults upon, and intimidation of, its employés designed to compel them to cease laboring for the company, and by like illegal acts to prevent others from entering such employment.    It would seem that more of the elements of the boycott are present than of the strike.    It may be well termed a lawful strike that has degenerated into a boycott in many respects not only illegal but criminal in character.    Counsel for these defendants has most ably argued that the purpose and object of the bill must be construed from its allegations to be only to protect the coal company in its contract with its present employés, to which contract the plaintiffs are not parties and therefore have in law naught to do.    If I could construe this to be the true purpose and object of the bill, I would have no trouble in sustaining the demurrer.    To so protect the men from intimidation and injury may be an incident of the relief sought, but the scope of the bill I conceive to be much broader.    It may, it seems to me, be epitomized from its apt allegations to be to protect the property of this company, depending for its sole value, as

alleged, upon its- ability to profitably mine and dispose of its coal in place thereon, which mining can only be done by individual employés; to protect it from inevitable breach of contracts with its customers whereby loss and damage will be incurred; to enable it lawfully to carry on its business, a property right it has, without illegal and criminal interference on the part of these alleged conspirators defendants, and this in order that the value of its property may not be lessened or destroyed, the lien of plaintiffs' trust bonds be thereby impaired or rendered valueless, but on the contrary, it may be permitted to fulfill its trust contract with plaintiffs by paying them the semiannual interest and the bond principal when due.

It would seem clear that the allegations of the bill justify an injunction in the premises at the instance of the coal company, had it applied for it to a court of competent jurisdiction. . The question then resolves itself into whether this court has right to grant it at the instance of these trust bondholders. The first objection that these bondholders hold an indebtedness of $24,000 only, with no allegation of other like bonded indebtedness outstanding against a property charged to be worth from $250,000 to $500,000 in value, would have been sufficient to refute the idea of irreparable injury to their rights and interests possibly, if the other allegations were not in the bill that the sole value of this property depends upon the ability of the company to operate at a profit the mining of its coal and the meeting of its interest charges and the payment of the principal of its indebtedness when due. Under these averments it must necessarily depend upon the evidence whether such allegations of the bill can be sustained. No matter how strong the presumption to the contrary may be upon final hearing, these allegations upon demurrer stand for confessed as true.

The second objection, that bondholders secured by a trust deed cannot maintain suit without alleging the refusal of the trustees to institute the same, is not tenable for these reasons: That a lienholder has right to an injunction against a trespasser, whether an owner or an outsider, is well settled. And it has been held that a mortgagee, a judgment creditor, a vendor's lienholder, and a bondholder secured by mortgage have a right to such relief. 1 Spelling, Ex. Rem. §§ 266, 267, 271, and 462. The right in such case is inherent in the person holding the lien security, and the form by which such security is held would seem to be immaterial. It would hardly be in accord with the true principles of equity practice to hold that a principal in interest could only act through his representative having no substantial interest but only as a trustee. The function of the trustee to preserve and maintain the existence of the property might possibly be broad enough to authorize him to maintain a suit for that purpose, if the creditors secured direct him to do so, but it is certainly not so broad as to prevent these creditors ·from protecting their own interests in the premises unless he shall permit them to do so.

My predecessor, Judge Jackson, in several cases similar to this, but not reported, has sustained injunctions awarded to bondholders, and no question has been heretofore raised as to the correctness of his ruling in this particular. I am persuaded that no good reason exists for now reversing it. I am aware of the fact that it is counter to the

ruling of Judge Ross in Consolidated Water Co. v. City of San Diego (C. C.) 89 Fed. 272, but with the utmost respect for the judgment of this learned judge, it seems to me there is a marked distinction between the cases cited by him in support of his position and the one here, or, to an extent, to the one he was deciding. A trust mortgage generally by its own express terms is a tripartite agreement between creditors, debtor, and trustee whereby the creditors as a class loan their money upon certain stipulated terms and conditions to the debtor, who secures these loans upon like terms and conditions by a lien upon designated property. To properly secure this lien, and further to create an agent for both creditors and debtor to secure performance of the mutual terms and conditions agreed upon, inter partes, the property is conveyed to a trustee with express powers to perform these conditions. Under such circumstances it has been well held that individual bondholding creditors thus secured must, before bringing suit themselves, request the trustee to sue touching all matters relating to the obligations inter partes created by the terms of the trust itself, such as the demand for accounting from the trust debtor or the demand for a foreclosure and sale. The reason in such cases is clear; the creditors are by the terms of the trust created a class with equal rights, and the trustee is created an agent for them as such. In many cases it would be distinctly against the interests of the other creditors to allow one or more of their number to institute proceedings for selfish reasons against the property, involving its management and calculated to destroy its credit or value. Such are the cases cited by Judge Ross. But in a case like this, when the bondholding creditor is not seeking to interfere with but to maintain the trust obligations and the trust subject from interference and destruction from outside sources, over which neither bondholder, debtor, nor trustee have any control, I can perceive neither any power, or at least obligation, on the part of the trustee, limited by the terms of his trust, himself to sue without direction from the bondholders or to prevent the bondholders from suing.

The third objection, that such bondholder before suing must allege that he has applied to the company to bring such suit, is fully answered, in my judgment, by the reasoning in the cases of Mercantile Trust Co. v. Texas & P. Ry. Co. (C. C.) 51 Fed. 529, Consolidated Water Co. v. City of San Diego (C. C.) 84 Fed. 369, and second decision in same case, 89 Fed. 272.

This brings us to the last objection made, that the coal company is a necessary party. Touching this question an apparent conflict of authority exists between the ruling of Judge Ross in Consolidated Water Co. v. City of San Diego, supra, affirmed by the Circuit Court of Appeals for the Ninth Circuit, 93 Fed. 849, 35 C. C. A. 631, and that of Judge Goff in Ex parte Haggerty (C. C.) 124 Fed. 441, but, as Judge Goff has pointed out, in this latter case radical difference in conditions existed, making the conflict only apparent and not real. Judge Goff in this Haggerty Case has so fully and lucidly set forth the reasons why in cases like this the company is not a necessary party that I can add nothing thereto.

The demurrer must be overruled.