VONNEGUT MACHINERY CO. v. TOLEDO MACHINE & TOOL CO. et al.

(District Court, N. D. Ohio, W. D.    February 7, 1920.)

No. 235.

1. INJUNCTION ⟨key⟩118(4)—BILL TO RESTRAIN INTERFERENCE WITH PERFORMANCE OF CONTRACT HELD SUFFICIENT.

A bill to restrain labor defendants from interfering with a manufacturing defendant's performance of its contract with plaintiff *held* to state grounds for equitable relief, within the rule that one party to a contract may restrain third parties who are substantially interfering with the contract's execution by the other party.

2. COURTS ⟨key⟩317—REALIGNMENT OF PARTIES IN STRIKE DISTURBANCE CASE UNNECESSARY IN DETERMINING JURISDICTION.

In a buyer's suit against a producing concern, which had agreed to sell it certain articles, and members of labor organizations, who were interfering with performance of the contract by strike disturbances, any rights of the manufacturing corporation against the labor defendants rest on different grounds than those of plaintiff, and defendant manufacturer need not be aligned as a party plaintiff, in testing whether a diversity of citizenship confers jurisdiction.

3. INJUNCTION ⟨key⟩114(3)—MANUFACTURING COMPANY NOT A NECESSARY PARTY IN SUIT TO RESTRAIN STRIKE DISTURBANCE INTERFERING WITH PLAINTIFF'S CONTRACT WITH COMPANY.

In a buyer's suit against a manufacturing corporation, which had agreed to supply it with certain articles, and members of labor organizations, which were interfering with performance of such contract by strike disturbances, the right of action against the labor defendants is an inde-

---

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

pendent right, and the manufacturing corporation is not a necessary party.

**4. INJUNCTION ⬤⇒147—PICKETING METHODS JUSTIFY TEMPORARY RESTRAINING ORDER.**

Evidence regarding the irritating and annoying tactics pursued by labor defendants in picketing a manufacturing establishment *held* to establish the wisdom of a temporary injunction.

**5. INJUNCTION ⬤⇒101(1)—CLAYTON ACT RELATING TO INJUNCTION IN LABOR DISPUTES SHOULD BE STRICTLY CONSTRUED.**

Assuming that Clayton Act, § 20 (Comp. St. § 1243d), relating to injunctions in labor controversies, discriminates in favor of a particular class and is still constitutional, the rule of strict construction applies and the language should be confined to its ordinary and usual force and meaning while maintaining the evident purpose of the act.

**6. INJUNCTION ⬤⇒101(1)—"TERMS AND CONDITIONS OF EMPLOYMENT" IN CLAYTON ACT DEFINED.**

In Clayton Act, § 20 (Comp. St. § 1243d), relating to injunction in labor disputes regarding the "terms and conditions of employment," the quoted words refer to disputes involving the employés' compensation and environment and are inapplicable, where employés quit because they did not wish to work on certain contracts their employer had.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Terms and Conditions.]

**7. INJUNCTION ⬤⇒101(1)—RELATION OF STRIKERS TO EMPLOYER FIXED BY REASON GIVEN AT TIME OF QUITTING.**

In determining whether an injunction should issue against picketing by persons quitting employment, in view of Clayton Act, § 20 (Comp. St. § 1243d), relating to injunctions in labor disputes, the relation of the strikers to their employer is fixed by the reason for quitting which they gave at that time.

**8. INJUNCTION ⬤⇒101(1)—PICKETING FOR SYMPATHETIC STRIKE PURPOSES RESTRAINED.**

Temporary injunction will issue against picketing by labor defendants, who quit work because they objected to working on certain contracts of their employer, and in order to injure their own employer as a means of coercing another employer, and where overt acts of intimidation and coercion had been committed.

In Equity. Bill by the Vonnegut Machinery Company against the Toledo Machine & Tool Company and others. Temporary injunction against certain defendants to issue.

Richard D. Logan, of Toledo, Ohio, for complainant.

Marshall & Fraser, of Toledo, Ohio, for defendant Toledo Machine & Tool Co.

Rob V. Phillips, of Toledo, Ohio, for union and labor defendants.

KILLITS, District Judge. The complainant, an Indiana corporation, began this action by filing, January 16, a bill against the Toledo Machine & Tool Company, an Ohio corporation, known herein as the "defendant company," and ten individual defendants, William Gable and others, who, with John J. Quinlivan and two others, and the Central Labor Union of Toledo and Toledo Lodge No. 105, International Association of Machinists, additional defendants brought in by an amended bill of complaint, filed January 21, before answer, will be known as the "labor defendants." On the coming in of the amended

bill, a motion to the jurisdiction was filed, the grounds being: (1) Insufficient allegation of fact to state a valid cause of action in equity against either of the defendants; (2) want of jurisdiction in this court upon the facts as alleged, either of the subject-matter or of the parties; (3) because the bill is not filed in good faith; (4) because the action is a result of collusion between complainant and the defendant the Toledo Machine & Tool Company; (5) because the amended bill "does not conform to come within the provisions of the statutes of the United States and of the equity rules governing proceedings" in federal courts. We are not advised by argument as to what is meant by this fifth ground. We do not have in mind any situation to which such objection is pertinent. There is nothing apparent, or even suggestive, on the bill supporting either the third or fourth grounds. Counsel for the labor defendants fail to advise the court on these subjects. The motion should have been and has been overruled on grounds 3, 4, and 5, for want of sufficiency plainly apparent in each instance, when compared with the record.

[1] So far as the first two grounds are concerned, an analysis of the bill shows the same to be not well taken, although we will notice them briefly. Going to the first, the bill not only alleges the existence of jurisdictional amount in controversy, but it proceeds upon the familiar and well-established theory that a right of action exists between one party to a contract and those third parties who are utter strangers to the contract, and who are by their conduct interfering substantially with the execution thereof by the second party thereto. Angle v. Railway, 151 U. S. 1, 14 Sup. Ct. 240, 38 L. Ed. 55; Board of Trade v. Christie, 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031; Mahon v. Guaranty Trust & Safe Deposit Co., 239 Fed. 266, 270, 152 C. C. A. 254; Annotations to L. R. A. 1917C, 777, and to 11 L. R. A. (N. S.) 202. This right of action exists against such third parties, even though there may be an adequate remedy at law in behalf of the first party to the contract against the second party for nonperformance. The first party should not be restricted to the inconvenience of the pursuit of a legal remedy against his contractor whose default is occasioned by third parties, strangers to the contract, who illegally obstruct its execution. Their wrongdoing may be the subject of equitable cognizance.

As to the second ground, so much thereof as relates to the sufficiency of fact to create jurisdiction in this court is answered by what we have already said touching the first ground, adding the suggestion that complainant is a nonresident of this district while all the defendants are residents herein. As we are left without advice by any argument from counsel of labor defendants as to what is the alleged vice of the amended complaint respecting parties, we can only surmise that it is thought that there is apparent upon the bill an inconsistent alignment upon the assumption that the resident defendant the Toledo Machine & Tool Company should be aligned with the complainant, thus destroying our jurisdiction.

[2, 3] In this respect this case closely parallels that of Dail-Overland Co. v. Willys-Overland, Inc., et al., 263 Fed. 171, recently conclud-

ed in this court. To the extent that the facts are analogous we apply our conclusions in that case. The authorities discussed in the opinion in that case (handed down December 27, 1919) on the subject of alignment of parties are applicable here, and there is no need to enlarge this memorandum by repeating that discussion. We cite the authorities: On the adequacy of relief at law, Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 12, 19 Sup. Ct. 77, 43 L. Ed. 341, Kilbourn v. Sunderland, 130 U. S. 505, 514, 9 Sup. Ct. 594, 32 L. Ed. 1005, and Tylor v. Savage, 143 U. S. 79, 95, 12 Sup. Ct. 340, 36 L. Ed. 82, to which may be added Angle v. Chicago, St. P., M. & O. Ry. Co., 151 U. S. 1, 25, 14 Sup. Ct. 240, 38 L. Ed. 55. On necessity of the defendant company as a party, Brown v. Denver Omnibus & Cab Co., 254 Fed. 560, 166 C. C. A. 118. On the criteria which determine the question of alignment of the principals to the contract affected by the unlawful conduct of the stranger parties, Hamer v. New York Ry. Co., 244 U. S. 266, 37 Sup. Ct. 511, 61 L. Ed. 1125, City of Dawson v. Columbia Trust Co., 197 U. S. 178, 25 Sup. Ct. 420, 49 L. Ed. 113, Mahon v. Guaranty Trust & Security Co., 239 Fed. 266, 152 C. C. A. 254, and West v. United States, 258 Fed. 413, —— C. C. A. ——, which cases we distinguish from the instant case, as well as from the Overland Case, and Carroll v. Chesapeake & O. Agency Co., 124 Fed. 305, 312, 61 C. C. A. 49, Carter v. Fortney (C. C.) 170 Fed. 463, and Iron Molders' Union v. Niles-Bement-Pond, 258 Fed. 413, —— C. C. A. ——. These authorities were considered in the Overland Case, and they are applied here.

The complainant alleges that it has contracts for the construction of machinery by the defendant company involving over $200,000, to be executed at expiration dates which are now respectively more than four months old; that the delay in execution is producing distinct damages to complainant and its customers; that the products to be manufactured are machines covered by patents owned by defendant company, and that licensees would be unable to prepare for the manufacture of those ordered within any reasonable time, to the accruing irreparable damage of the complainant and its customers; that the only reason given by defendant company for its default upon these contracts is that the full control of its business has been interfered with by the unlawful conduct of the labor defendants and their associates, who are, it is alleged in the bill, conspiring to unlawfully interfere with defendant's business in execution of which conspiracy they are picketing the defendant company's plant, intimidating and abusing its employés, and thereby not only greatly interfering with the output of the defendant company with its present force of employés, but preventing defendant company from enlarging its working force to meet the demands of its engagements; that the picketing in question is not carried on in the interest of any employés of the defendant company, and that no labor dispute exists between the labor defendants in this case or parties whom they represent and the defendant company; that the defendant company has not taken, and refuses to take, any steps to secure the protection of the authorities of Ohio to preserve its lawful business from unlawful molestation; that the machinery which is the subject-matter of com-

plainant's contracts with the defendant company is to be manufactured to be delivered in interstate commerce to beneficiaries under these contracts who are respectively beyond the state of Ohio; and that the labor defendants are engaging in a conspiracy to interfere with interstate commerce through intimidation of the employés of the defendant company and those seeking to enter its employment.

The prayer is for a mandatory injunction against the defendant company compelling it to execute these contracts and to protect itself in that behalf by resort to those agencies of protection to which it is entitled to appeal, and for an order against the labor defendants and all parties colluding and in sympathy with them, restraining a continuance of picketing and the pursuit of the alleged conspiracies while the latter is engaged upon the execution of complainant's contracts. A temporary restraining order was allowed after notice and upon testimony, since which time the record has been enlarged by the filing of an answer and cross-bill of the Toledo Machine & Tool Company and joint and several answers to the pleadings of plaintiff and of the defendant company have been filed in behalf of all of the labor defendants. These pleadings are considered now as affidavits, only, upon the motion for a temporary injunction, so far as they aver affirmative matters of fact. Considering for all purposes, however, the answer and cross-bill of the defendant company, we see no reason to sympathize with the continued notion of the labor defendants that the action is collusive between the defendant company and the complainant. In the Overland Case, upon the authority of Venner v. Railroad Co., 209 U. S. 24, 32, 28 Sup. Ct. 328, 52 L. Ed. 666, we said:

"The fact that the Overland should be satisfied to enjoy the relief coming to it, if its contractor should invoke the successful operation of a federal court's protective power, is not enough to charge it with collusion with the latter in bringing this action, or even to require it to be aligned with the latter."

This observation is equally applicable to the situation here, and the coming in of its answer and cross-bill does not make it a necessary party to the issue the complainant has with the labor defendants. The defendant company owed to the complainant a duty to protect itself against those unlawful acts of the labor defendants which were interfering with the execution of its contracts with the complainant, and that fact makes it an antagonist to the latter respecting an issue which the complainant could raise without making the labor defendants parties. Upon the authorities already cited, we see that the complainant has an independent right of action against the labor defendants themselves to require the latter to keep their hands off of contractual relationships, to which they are strangers, between the complainant and the defendant. Again, an observation we made in the Overland Case is pertinent here that—

"The cases cited support the point that the criterion is not merely that the complainant and that defendant who, it is alleged, should be aligned with complainant, have an interest of the same quality in the result prayed for, but it is whether they are privileged to assert their respective interests upon the same grounds."

The right of action which complainant may have against the defend-- ant company is not the same right of action which it has against the labor defendants; that the latter may benefit from the successful outcome of complainant's contention is merely an incident.

We are entirely supported in these conclusions by West v. United States, 258 Fed. 413, 417, 418, —— C. C. A. ——, a decision by our own Circuit Court of Appeals. The Niles-Bement-Pond Company, a West Virginia corporation, brought an action in the Southern district of Ohio against the Niles Tool Works Company, an Ohio corporation, the Iron Molders' Union, and a large number of individual labor defendants. As in the instant case, contractual relations between the complainant and the Tool Company were set up, with the allegation that the unlawful acts of the labor defendants in that case were interfering with the execution of the contract. 246 Fed. 851. In the final hearing it developed that the defendant company was essentially a subsidiary of the plaintiff. On this state of the record the Circuit Court of Appeals (258 Fed. 408, —— C. C. A. ——), reversed the District Court, on the ground that the plaintiff and defendant company should have been aligned together. A temporary injunction, however, had been granted on the averments of the bill and before the intimate connection between the two corporations had been disclosed. This injunction had been violated by West, a labor defendant, who was attached for contempt and subsequently indicted and convicted for perjury alleged to have been committed at the contempt hearing. The conviction was sustained, however, by the Circuit Court of Appeals on the holding that the temporary injunction, which was at the basis of the contempt action, rested, so far as jurisdiction was concerned, upon a sure foundation, in that the bill itself disclosed no feature compelling the alignment of the defendant the Niles Tool Company with the complainant. The bill in the case, while making the Tool Company a defendant, presented its principal claim for relief against the labor defendants, and the question was, of course, acute whether the bill showed a cause of action existing between the complainant and such defendants. Of this situation and the disclosures in the bill affecting jurisdiction, the court said (258 Fed. 417, —— C. C. A. ——):

"We think the petition, standing alone, was not subject to motion to dismiss for lack of diversity of citizenship. The Niles-Bement-Pond Company's right to the exclusive sale of the tool company's output, and the former's interest in the latter's performance of subsisting contracts, tended to show an independent right to file a bill for relief."

That is, of course, an independent right to file a bill against the labor defendants for relief as in the instant case. The facts in the amended bill herein, as well as shown in evidence, are much more strongly indicative of an independent cause of action against the labor defendants than those shown in the Niles-Bement-Pond bill.

[4] The testimony first before the court suggested that the character of the picketing sought to be restrained was wholly objectionable, unlawful, and utterly beyond the sanctities of even an extravagant construction of the privileges of the act of October 15, 1914, commonly

known as the Clayton Act (Comp. St. §§ 1243d, 8835f). It showed that the pickets used language which was minatory, insulting, abusive, and in some instances downrightly obscene; that their conduct was that which would call upon a court, without hesitation, to order and to enforce immediate restraint. It was of a character which could not be sustained by any valid legislation.

This record was received on the present motion, and additional testimony was offered on both sides, and that in behalf of the defendants, several, not all, of the latter going on the stand, raised issues of fact as to the most vicious features alleged against the character of the picketing. Countercharges were also made that workmen in defendant company's plant, including a foreman, had been guilty of abusive, vulgar, and insulting language toward the pickets. There was a main entrance to the factory, through which several hundred employés entered to and departed from their work. The pickets, 8 to 12 in number, congregated on the sidewalk immediately about this door, and it was admitted that by this gauntlet men doing business with this factory were obliged to pass and to hear observations, shouted generally or personally addressed, which had in them a threatening and insulting note. Workmen were told that they were being carefully looked over, with the inference that this was for future identification; that they were inferentially scabs and strike-breakers, because they were associating with and assisting such obnoxious people. By a strange oversight of the right of the defendant company to dominate the street abutting upon its own property to the center line against all uses thereof, except those which clearly were within the easement rights of the public, the city council so far encouraged the labor defendants as to permit erection and maintenance of a shanty between the curb and the sidewalk near this entry, in which a stove was kept, that the pickets might warm themselves. The situation was so tense that for months the city maintained a substantial force of uniformed policemen near the entrance, and there were several arrests made of workmen on complaint of the pickets. These policemen testified that they neither saw nor heard anything that was objectionable on the part of the pickets. Some of the latter, however, on the stand frankly admitted that they used language which they considered necessary to deter men from entering the plant, and that this language was of a character already discussed, and that the purpose was to embarrass the defendant company.

Human nature being substantially a constant quality, reacting somewhat uniformly to influences of the same class, it is not difficult to believe that the antagonisms produced by the activities of the pickets, even should they have been minded to restrain themselves, were likely to develop harsh and contentious and abusive language. The situation was tense. The strike in question was plainly to assist the labor side of the Overland controversy, the facts of which are brought into this record because they created the atmosphere into which the instant transactions under present consideration were enveloped, and from which interpretative criteria are clearly derivable. The Overland difficulty had resulted in bloodshed, loss of lives, destruction of property, and much shameful abuse of private right. It was in this en-

vironment of excited passions and strained judgments that these men, pickets and workmen, acted and reacted.

In ordinary conduct men use the vocabulary of their class, and, when their interests are actively aroused and their passions stimulated, the bonds of their own conventions are soon snapped, and their verbal weapons begin to lose refinement. We would expect a picket line of college metaphysicians, or of theologians, who were really spiritually sweet and supernaturally self-controlled, to maintain, under extreme aggravation, a course of action which might be calmly persuasive and well within the theory of the law; but men of more vigorous pursuits, especially if their vocations, as well as their avocations, bring them into more robust and more worldly contacts, tend much more quickly, when milder measures seem to effect little of their aims, to what is known in radical parlance as "direct action," and when that element comes into the picket line, even in vocal form, peaceful persuasion takes its flight.

It is because the passions of an acute labor controversy tend to mount beyond control, releasing conventional restraints upon social intercourse, that practical people question the possibility of peaceful persuasion through the practice of picketing. The observations of the late Judge McPherson in Atchison, T. & S. F. Ry. Co. v. Gee (C. C.) 139 Fed. 582, 584, are pertinent at all times and are applicable to the present record. He said:

"There is and can be no such thing as peaceful picketing, any more than there can be chaste vulgarity, or peaceful mobbing, or lawful lynching. When men want to converse or persuade, they do not organize a picket line. When they only want to see who are at work, they go and see, and then leave, and disturb no one physically or mentally. But such picketing as is displayed in the case at bar by the evidence does, and is intended to, annoy and intimidate. The argument seems to be that anything short of physical violence is lawful. One man can be intimidated only when knocked down. But the peaceful, law-abiding man can be and is intimidated by gesticulations, by menaces, by being called harsh names, and by being followed, or compelled to pass, by men known to be unfriendly. Perhaps such a man may not be a bully, but is frail in size and strength, or he may be a timid man; but such a man is just as much entitled to go and come in quiet, without even mental disturbance, as has the man afraid of no one, and able with or without weapons to cope with all comers. The frail man, or the man who shuns disturbances, or the timid man, must be protected, and the company has the right to employ such."

In Union Pac. Rd. Co. v. Reuf et al. (C. C.) 120 Fed. 102, a leading case on this subject, Judge McPherson observed that such picketing was condemned by all courts having the subject under consideration. His comment, true in 1902, is equally true at the present time. Langell v. Collingwood, 178 Mich. 305, 144 N. W. 841, 50 L. R. A. (N. S.) 412, and notes; Jensen v. Cooks' & Waiters' Union, 39 Wash. 531, 81 Pac. 1069, 4 L. R. A. (N. S.) 302, and notes.

At the very best, it is easy to understand how the presence of pickets doing what it is here admitted they did would irritate and annoy the working force and thus disturb the morale of the factory personnel; that substantial friction was produced because of the practices. The charges against the loyal workmen themselves show that.

It is sufficient, certainly, to suggest that conduct which provokes such a feeling that the subjects of "picketing" become restive to the point of hot and abusive retort should lose the characterization of "peaceful" persuasion; it is compellingly presumable that the freedom of action enjoyed by those who would enter this plant unmolested had been invaded, if they were moved to action which compelled complaint against them on the part of the pickets themselves. That defendants were working in concert, in behalf of themselves and associates in the defendant machinists' union, to accomplish just what actually was effected, a crippling, by intimidating means, the lawful business of the defendant company, there is no room for doubt.

Without accepting as established the extreme characterization of the conduct of pickets found in the testimony, we find that proof enough of its objectionable character is in the record to indicate clearly the wisdom of a temporary injunctional order. There is no evidence, however, that it should run against defendants Quinlivan and the Central Labor Union.

[5] The interesting and unique question in this case, however, is whether we have a situation here contemplated by and within the provisions of the first paragraph of section 20 of the so-called Clayton Act (Act Oct. 15, 1914 [Comp. St. § 1243d]), and consequently one in which the court's injunctional powers are limited in view of any construction of the force of that measure. Concretely the query is whether at the foundation of this case is a controversy between employer and employés respecting terms and conditions of employment. If the Clayton Act is a discriminatory one, being in that respect class legislation, and assuming that it is yet constitutionally sustainable, an established and entirely valid rule of construction is applicable to the effect that the terms used should be strictly kept to their ordinary and usual force and meaning, while maintaining at the same time consideration of the evident purpose of the act. A law giving special immunities to a class necessarily impinges upon the rights of those against whom the statutory discriminations operate. The disturbance of parity of legal privileges between parties to a controversy manifestly affects rights, hence the rule of strict construction applies. 36 Cyc. 1179.

[6] The construction which would emasculate the act is no more unjust than that liberality of interpretation which would expand its provisions beyond the clearly understood purpose of the measure. What is the scope of the language "terms and conditions of employment," for these words, from section 20 of the act in question, need interpretation here? The court should not attempt an inelastic definition. One should be given which would keep step with the advance in sentiment, as conditions change, to make good the very proper demand that the laboring man should receive consideration from his employer which will maintain his health and self-respect, and secure to him the full measure of the fruits of his toil, while preserving to him all those opportunities for social intercourse, and self-improvement which should be his to enjoy that he may realize his aspirations. But even a most liberal definition in this direction has its limitations.

The mind, in considering the words "terms and conditions of employment," unconsciously, but directly, goes to a contemplation of such things as hours of labor, wages, classification of employés, sanitary and physical conditions controllable by the employer, opportunities for reasonable redress of grievances, and for bargaining respecting the conditions of employment, whether collectively, as enlightened public sentiment as well as convenience approves, or individually. This view is well supported in this case by the character of the new contract which the labor organization tendered in writing to the defendant company, and which had been under consideration before the strike. Its fifteen paragraphs deal exclusively with subjects, as "terms and conditions of employment," which come within the above limitations. At the time of the strike, the factory was what is known as an open shop, and the proposed new agreement with the defendant labor organization recognizes, as a condition tendered by the latter itself, that the factory should remain open.

In no case, however, does it seem possible that the definition of this term should be so wide as to make the employé a dictator to his employer respecting the manner generally, and beyond the above-indicated limitations, in which the latter should conduct his business. It is possible, of course, to conceive of things which have a collateral tendency to affect those considerations to which the employé is entitled. He may have a collateral interest in the success of a labor dispute with another employer, so that he nurses an impulse to help through a sympathetic strike against his own employer, with whose conditions of employment he is entirely satisfied. But to enter the field of collateral possibilities is to explore a territory without boundaries, where lurk immeasurable and unbearable restraints upon industrial freedom. A certain line must be drawn somewhere. It surely is at the place where a man whose asset is his daily toil has guaranteed to him sufficient recompense and proper environment. Therefore no conceits or whims, or mere prejudices, of the employé, may be by him elevated to the dignity of terms and conditions of employment, to be protected in any degree by the statute in question, and thereby to become the basis for a demand under it of a discriminatory nature. The employé may refuse to work—that is, he may strike—for any reason, however frivolous; but, if he strikes for a whim, the controversy so brought about does not gain that status which would bring into operation the act in question.

In the present instance, the testimony shows that on the 13th of August, last, certain employés of the defendant company struck, not because they objected to hours of labor, not for better wages, not for new classifications, not because there was anything objectionable in physical or sanitary conditions at the factory, not because they were interfered with in any degree respecting their privilege for bargaining, but simply and solely because they did not like a customer with whom the employer was doing business—only because they did not care to work on certain contracts their employer had. It is true that a new working agreement to supersede the one whose term had expired, and upon which the men were insisting, had not been

signed; but it is most clear that the objection to Overland work alone precipitated the strike. Before this action was taken, the Grand Lodge of Machinists was consulted under union rules respecting sanction of strikes, and "sanction" was given, by this superior authority, to go out for this cause only. The last action of the "shop committee" of the men was simply on this ground. The evidence is clear that no other reason was offered. Some time afterwards attempts were made to negotiate for reinstatement on the basis of a new agreement, coupled with the company's abandonment of the work in question; but it is quibbling only to argue that, on August 13, the controversy actually involved anything else than the latter condition.

[7] The relation of the strikers to their employer was fixed by the reason they gave at the time. No subsequent enlargement of conditions for re-engaging with the company created by them may be allowed retroactive application, to affect the relation which resulted from the action as it was actually taken. In Railway Co. v. McCarthy, 96 U. S. 258, 267 (24 L. Ed. 693) the court, by Justice Swayze, said:

"Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law."

This rule is well established, and its application is compellable, by close analogy, to the situation here. To say that a situation created for the reason given is under favor of the law in question is to make this legislation a weapon for socialization of industry. If the "shop committee" can direct the stopping of the employer's business on the ground that the latter's customer is offensive, there is no limit upon its domination over the employer's affairs. Such an organization as a "shop committee" becomes, in substance, if not in name, a "soviet"; for the employer would become at its mercy to paralyze any substantial detail of his business, however remotely that might affect that welfare of his workmen which the law very properly attempts to secure. Congress surely never intended to so cripple the industries of the country—to so broadly and unfairly discriminate in favor of a class— to so violate the clearest public policy.

Considering, as we must, the insufficiency of the reason given for leaving their employer's service to bring defendant company's striking workmen within the provisions of the Clayton Act, it follows necessarily that they must be regarded, from the day of their abandonment of that service, to be strangers to their late employer's business. If, indeed, the law just considered at length favors striking employés for a time after the crisis by continuing to them the status of employés, notwithstanding they were not at work, and idle because they preferred to strike, these particular men were not to be so considered, respecting defendant company, after August 13.

[8] The picketing in question, therefore, presents a not unusual, but, in the judgment of this court, the always unlawful, situation of persons who stand in no special relationship to an employer—persons who have no privileges not common to all men—attempting to inter-

fere with the business of such employer by propagandic activities directed against his working force, or his product, or both. We are aware that a notion is widely entertained that any employer may be organized against by any body of persons, with a view to affecting the manner in which he transacts his business; but such an impression is not, by any means, justified as broadly as it is held. One may freely choose the manner in which he will conduct a lawful business, accountable only to the police power of his community, and to him is given freedom of contract for employment therein. If he and his employés are in contractual relationship respecting terms and conditions of employment, opportunity is not lawfully given to others to interfere. Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461, and Eagle Glass & Mfg. Co. v. Rowe, 245 U. S. 275, 38 Sup. Ct. 80, 62 L. Ed. 286. Having left their employment for no reason which the law specially favors, the labor defendants here, and their associates, had only the rights, and were under the disabilities, of the general public respecting the conduct of the business of the Toledo Machine & Tool Company. The defendant Toledo Lodge No. 105, International Association of Machinists, had no more liberty in law or public policy, in the circumstances of this case, to "picket" the defendant company's factory to change conditions of labor therein than any other association of men enjoyed to bend the defendant company to its will.

To the labor defendants, therefore, and to the defendants representing them, become applicable those settled principles respecting organized picketing which a long line of adjudications already referred to has established. They have the privilege of free men, which means that what rights they claim for themselves they must allow to others. They cannot be permitted to annoy any individual who peaceably seeks to obtain or retain employment with the defendant company. They must not obstruct the free exercise of the right of the defendant company to transact its lawful business, by harassing in any degree its workmen, or those attempting to do business with it.

While the evidence is not so strong as in the Overland Case as to the extent to which defendant company had made good the loss of force and lowering of output resulting from the strike, it does appear here that the company had so far overcome its difficulties that the futility of a continuance of the "dispute" by the defendants was most apparent. What, therefore, we have said in the Overland Case touching the decision whether a substantial "dispute" continues applies here. Before this action was commenced this court had decided that the Overland strike was over, in that the effort by certain of its late employés to force that company to certain terms of employment had manifestly failed. As the contention raised by the labor defendants here was in support of the lost cause at the Overland, it is unnecessary to demand more proof of the absurd uselessness of keeping up the quarrel on a picket line than we have in this record.

Respecting another phase, the right to ask for injunctional relief is apparent. Defendants, other than the company, are charged, sustained

by prima facie proof, with unlawful conspiracy. Certainly they struck to assist a contention to which their employer was, in law, a stranger. Their purpose was to injure their employer as a means of assisting the coercion of another employer, and, in the execution of an unlawful purpose (and this was an unlawful purpose) overt acts of intimidation and coercive espionage were committed. This situation is not protected by any legislation whatever and is condemned by the undeviating current of judicial opinion. Toledo, Ann Arbor, etc., Ry. Co. v. Pennsylvania Co. (C. C.) 54 Fed. 730, 738, 19 L. R. A. 387; Callan v. Wilson, 127 U. S. 540, 556, 8 Sup. Ct. 1301, 32 L. Ed. 223; Pettibone v. United States, 148 U. S. 197, 203, 13 Sup. Ct. 542, 37 L. Ed. 419.

It is clear, in the judgment of the court, that the evidence before the court on the motion tends to show that (a) employés of defendant company, in whose behalf the labor defendants here are acting, struck, August 13, for a reason which was not under the favor of any law; (b) that thereby all employment relations between them and defendant company terminated absolutely; (c) that the labor defendants and those represented engaged forthwith in a conspiracy to unlawfully obstruct the business of defendant company; (d) that the picketing shown in this case is a continuing overt act in the consummation of the purpose of such conspiracy; (e) that the conduct of the several defendant pickets is, independent of its purpose, unlawful, in that it is intimidating and coercive in character, intended to bring about, and is accomplishing, the annoyance and incensing of employés of defendant company and of those seeking employment with said company. A temporary injunction shall issue.

The court has not had time to consider the issues arising between the complainant and the defendant the Toledo Machine & Tool Company. It is plain, however, that, assuming obedience to the temporary injunction granted against the labor defendants, the special defenses of the defendant company to the application of the complainant for a mandatory order against it will have little weight, and it is anticipated, of course, that the defendant company will proceed to the execution of the contracts in question with the complainant company with no further delay. Right is accorded to the complainant to bring this matter to the court's attention at any time, should there be occasion in its judgment.